STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-357

BARBARA HYPOLITE

VERSUS

COLUMBIA DAUTERIVE HOSPITAL, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 93819-D
HONORABLE WILLIAM D. HUNTER, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and J. David Painter, Judges.

AFFIRMED.

Kenneth Michael Henke
Special Assistant Attorney General
100 East Vermilion Street - Suite 400
Lafayette, LA 70501
Telephone:  (337) 233-1100
COUNSEL FOR:
    Defendants/Appellees - Louisiana Patients' Compensation Fund, Dr.
    Donald R. Blue, and Columbia Dauterive Hospital

George Allen Walsh
601 Napoleon Street
Baton Rouge, LA 70802
Telephone:  (225) 381-9305
COUNSEL FOR:
    Plaintiff/Appellant - Barbara Hypolite

**Lucretia Pecantte-Burton**
**P. O. Box 13738**
**New Iberia, LA 70560**
**Telephone:  (337) 367-1779**
**COUNSEL FOR:**
      **Plaintiff/Appellant - Barbara Hypolite**

**THIBODEAUX, Chief Judge.**

The plaintiff-appellant, Barbara Hypolite George (Ms. Hypolite)[1], filed a medical malpractice action against the Louisiana Patients' Compensation Fund (PCF), Dauterive Hospital Corporation, Inc., and an obstetrician, Dr. Donald Blue. Ms. Hypolite sought damages arising out of alleged negligent care received during her labor-inducement and subsequent period of labor, which she claims led to a ruptured uterus and subsequent hysterectomy. The jury trial ended in a verdict in favor of the defendants and against Ms. Hypolite. Ms. Hypolite has appealed, claiming that the jury erred in finding that the defendants did not breach their respective standards of care. We affirm.

I.

**ISSUE**

We shall consider whether the plaintiff presented sufficient evidence at trial to establish that the defendants breached their applicable standards of care.

II.

**FACTUAL BACKGROUND**

On June 4, 1998, Ms. Hypolite began receiving prenatal care for a high-risk pregnancy at the Women and Children's Clinic of Columbia Dauterive Hospital (Dauterive), located in New Iberia, Louisiana. At the time, she was approximately five months pregnant with her second child and was a month away from her thirty-sixth birthday. On her initial visit to Dauterive her blood pressure was 128/60, and at a height of five feet, one inch, she weighed 213.5 pounds and was considered

---

[1]The plaintiff instituted her action as Barbara Hypolite, but had divorced and remarried as of the time of trial and her subsequent appeal. For the sake of clarity, we will refer to the plaintiff as Barbara Hypolite.

obese.  She was diagnosed with immune thrombocytopenia, a condition signifying low blood platelet counts; platelets are essential for blood clotting.

Ms. Hypolite also exhibited a number of other factors signifying a possible high-risk pregnancy.  They included:  possible hypertension, a prior thirty-three week, pre-term delivery of a child weighing three pounds, nine ounces; a history of alcohol abuse, which also occurred during that prior pregnancy; a history of marijuana and crack cocaine use (her admitted last use of crack cocaine was ten months prior to her June 4th prenatal visit); and, the fact that she was a smoker.

The sequence of events giving rise to the complaints of negligent medical care began on Friday, September 25, 1998.  Ms. Hypolite was assessed by Allison Clark, a nurse midwife, during a scheduled prenatal appointment.  The pregnancy had reached term, and an ultrasound showed that the baby was large, weighing possibly nine or ten pounds.  Ms. Hypolite's weight had increased to 237.5 pounds.  She was assessed for pre-eclampsia and showed an elevated blood pressure of 142/85.  It was determined that labor would be induced on Monday, September 28, 1998, due to the baby's possible large size, her elevated blood pressure, and a moderately low blood platelet count.

Ms. Hypolite arrived alone on the morning of September 28, 1998, for the scheduled induction.  At approximately 6:00 a.m., Rebecca Davis, another nurse midwife, explained to Ms. Hypolite the induction process and the options of undergoing a caesarean delivery or a trial of labor and a vaginal delivery.  Ms. Hypolite opted for the inducement of labor and a natural, vaginal delivery. Ms. Davis explained that the induction would be instituted using an intravaginal insertion of the drug Cytotec, which would aid contractions and the ripening of the cervix.  She also advised Ms. Hypolite about the risks of the use of Cytotec.  One of the risks was a

possibility that the uterus could react too strongly to the drug and that a risk of its use was also uterine rupture. Ms. Hypolite verbally consented to the use of the Cytotec for the induction. Eve Talley, a registered nurse who cared for Ms. Hypolite that day until her shift ended at 3:15 p.m., witnessed this exchange between Ms. Hypolite and Ms. Davis.

A pelvic examination was performed by Ms. Davis, revealing that Ms. Hypolite's cervix was 50% effaced and was one centimeter dilated. Ms. Hypolite's platelet count remained moderate. The first dosage of Cytotec was then administered by Ms. Davis at 7:03 a.m. Regular uterine contractions began. Ms. Hypolite received a second dosage of Cytotec five hours and forty-five minutes later, at 12:45 p.m. Her labor continued through the afternoon. Ms. Hypolite complained of severe pain and distress throughout her trial of natural labor that day.

That afternoon, Ms. Hypolite began showing increased blood pressure. At approximately 4:45 p.m., her blood pressure was 155/80. At 4:50 p.m., Ms. Hypolite's blood pressure was 179/103. Dr. Blue was notified of the elevated pressure, and at 5:00 p.m., he examined Ms. Hypolite. Her blood pressure was 160/120, and fetal bradychardia, which is a slowed heart rate and an indicator of fetal distress, was noted. The baby's baseline heart rate was 70-90 beats per minute, which was below the normal heart rate range. Ms. Hypolite was unsuccessfully repositioned several times to attempt to increase the baby's heart rate. Dr. Blue consequently ordered an emergency cesarean delivery. Ms. Hypolite signed consent forms prior to undergoing the procedure.

Dr. Blue successfully delivered a ten pound baby boy via cesarean section. After the removal of the placenta and membranes, Dr. Blue discovered a tear in the left side of Ms. Hypolite's uterus and a broad ligament hematoma, which

dissected into the upper part of the uterus and the lateral wall.  Ms. Hypolite was bleeding heavily, and it was determined that her uterus was only connected to the cervix by three to four centimeters, posteriorly.  Dr. Blue determined that the damage was too severe and that a total abdominal hysterectomy would be necessary.  He proceeded to perform the procedure.  Ms. Hypolite lost an estimated 1,000 cubic centimeters of blood and was transfused with two units of packed cells.  She was transferred to the intensive care unit where she recovered well.

Ms. Hypolite subsequently filed a complaint of medical malpractice with the State of Louisiana for substandard care she claims to have received from the nursing staff and Dr. Blue.  All medical records were submitted for review to a medical review panel consisting of three physicians with specialties in Obstetrics and Gynecology.  The panel found that there was no breach of the applicable standards of care by either Dr. Blue or the nurses at Dauterive.

Ms. Hypolite proceeded to file a suit for damages in state court.[2]  That suit alleged that the Dauterive nurses breached the standard of care required under the circumstances because they:  (1) failed to properly monitor and timely respond to her distress following insertion of the Cytotec pills; (2) failed to obtain her informed consent for the use of Cytotec to induce labor; (3) failed to timely summon a doctor when expert medical attention was needed; and (4) acted unreasonably by administering Cytotec to her without a specific physician's order directing its use.  Ms. Hypolite claimed that Dr. Blue also breached the standard of care required under the circumstances by:  (1) failing to timely examine and monitor her condition; (2) failing to properly instruct the nurse midwives regarding the signs of distress

---

[2]Ms. Hypolite's action in state court was originally filed against Dauterive Hospital Corporation, Inc., Dr. Donald R. Blue, LAMMICO Insurance Company, and G.D. Searle & Co. LAMMICO and G.D. Searle & Co. were dismissed from the action prior to trial.

associated with the use of Cytotec; and (3) failing to obtain her informed consent to the use of Cytotec. Ms. Hypolite sought compensation for a non-exclusive list of damages, including the loss of her ability to bear children, loss of a body organ, physical pain and suffering, mental anguish, a prolonged hospital stay, and medical expenses.

The jury found that neither Dr. Blue nor Dauterive, through its nursing staff, breached the applicable standards of care. It is from this judgment that Ms. Hypolite has appealed.

III.

## LAW AND ANALYSIS

### *Establishing Liability*

Louisiana Revised Statutes 9:2794(A) sets forth the plaintiff's burden of proof against a physician licensed by the State Board of Medical Examiners pursuant to La. R.S. 37:1261, *et seq.*, in a medical malpractice action. The plaintiff must establish:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

*Id*. In summary, "[t]he plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom." *Pfiffner v. Correa*, 94-924, p. 7 (La. 10/17/94), 643 So.2d 1228, 1233.

Nurses performing medical services are subject to the same standards of care and liability as physicians. *Pommier v. ABC Ins. Co.*, 97-1342 (La.App. 3 Cir. 7/15/98), 715 So.2d 1270, *writs denied*, 98-2455, 98-2456 (La. 11/20/98), 729 So.2d 562. The hospital is responsible for the negligence of its employees, including nurses, under the doctrine of *respondeat superior*. *Id*. Consequently, in a medical malpractice action such as this one against a hospital, this plaintiff must prove that the hospital, acting through its nurses, owed this plaintiff a duty to protect against the risks involved, that it breached that duty, that the plaintiff suffered injury, and that the purported negligent action was a substantial cause in fact of injury. *Id*. (citing *Farmer v. Reyes*, 95-0734, 95-0735 (La.App. 4 Cir. 11/16/95), 665 So.2d 129; *Seal v. Bogalusa Cmty. Med*. Ctr., 94-1363 (La.App. 1 Cir. 11/9/95), 665 So.2d 52).

The question of whether conduct fell below the applicable standard of care is a factual determination subject to the manifest error standard of review. *Curtis v. Columbia Doctors' Hosp. of Opelousas*, 03-916 (La.App. 3 Cir. 12/17/03), 862 So.2d 1125. In order to determine whether a standard of care was breached, opinions of medical experts are usually necessary to determine the applicable standard of care under the circumstances and whether there has, in fact, been a breach. *Pfiffner*, 643 So.2d 1228; *see also, Herpin v. Witherspoon*, 95-370 (La.App. 3 Cir. 11/2/95), 664

6

So.2d 515. In this case, the jury was presented with conflicting opinions from multiple medical experts. Based on the facts presented in the record, we find that the jury made reasonable credibility determinations and reasonably weighed the evidence presented. *See Stobart v. State, through the Dept. of Transp. & Dev.*, 617 So.2d 882 (La.1993). Consequently, we cannot say that the jury's verdict is manifestly erroneous or clearly wrong.

### *Induction Using Cytotec and Care During Labor*

Ms. Davis, who was qualified as an expert in nursing, testified specifically regarding Ms. Hypolite's September 25, 1998, appointment that resulted in the decision to induce Ms. Hypolite. She also testified about the events of Ms. Hypolite's induction on the morning of September 28, 1998. As a part of Ms. Hypolite's malpractice claim, Ms. Hypolite contends that a decision was made to induce her for a vaginal delivery on the morning of September 28, 1998, using the drug Cytotec, although a necessary cervical examination of her was not conducted first to determine her suitability for inducement using this drug. She contends that this was a breach of the standard of care that she should have received from the treating nurses and Dr. Blue, who consulted on her case.

She offered the testimony of Melinda Carmouche, R.N., who was qualified as an expert in nursing, which stated that the failure to perform this exam constitutes a breach of the nurses' standard of care for this patient. This contention, however, was wholly disproved at trial by Ms. Davis, the nurse midwife, who established through Ms. Hypolite's medical records, specifically the Prenatal Flow Sheet maintained by the Women & Children's Clinic of Dauterive, that Ms. Allison Clark, another nurse midwife, did conduct a cervical examination on September 25th, prior to the decision to induce. In addition, Dr. Blue testified that he was consulted

7

by the Nurse Midwife regarding the recommendation to induce, and was presented with the necessary information to assess Ms. Hypolite's suitability and progression towards delivery. He agreed with the recommendation of the Nurse Midwife to induce on September 28, 1998, using the normal protocol for Cytotec.

Secondly, Nurses Talley and Davis testified in opposition to Ms. Hypolite's contention that she was not informed of the risks and benefits of the use of Cytotec, that she did not give her informed consent to its use before her induction, that she was administered Cytotec by the nurses without an approved order to do so, that her second dose of Cytotec was administered too soon, and that she was given improper dosages of Cytotec. Specifically, Ms. Davis testified that she counseled Ms. Hypolite on the risks and benefits of Cytotec on the morning of September 28, 1998, shortly after she was admitted for the induction. Nurse Eve Talley was present. According to the two nurses, Ms. Hypolite arrived at Dauterive at approximately 6:00 a.m. She was counseled by Ms. Davis regarding the Cytotec, as well as the pros and cons of labor versus cesarean delivery. Ms. Hypolite did not ask any questions and provided her verbal consent to the use of the Cytotec.

Additionally, the nurses both testified that Ms. Davis commenced the induction by inserting a fifty microgram dose of Cytotec intravaginally. Nurse Talley witnessed this. According to both nurses, the Cytotec was administered according to Dauterive's standard protocol for its use at the time, which was twenty-five to fifty micrograms every four to six hours. Nurse Talley received the dose from the pharmacy, in the form of one-half of a 100-microgram pill and provided it to the midwife for insertion.

Regarding Ms. Hypolite's claims of inadequate monitoring, Nurse Talley testified that her shift began at 6:00 a.m. that morning and, as a result, she was the

8

registered nurse responsible for Ms. Hypolite's monitoring during her course of labor for the majority of that day. She was required to report to the nurse midwife and the nurse midwife, in turn, would report to the consulting physician, as needed. Consequently, she provided further testimony refuting Ms. Hypolite's sole testimony that the nursing staff failed to respond to her repeated and desperate calls of distress throughout the day in a timely fashion, which allegedly resulted in their failure to recognize the serious trouble she was in. Nurse Talley also responded to Ms. Hypolite's contention that during her trial of labor, the nursing staff restrained her to the bed by her wrists and ankles. Nurse Talley testified that Ms. Hypolite was the only patient in labor on the floor that day. She further testified that her Nurse's Notes and notations made on the fetal heart rate monitor strips generated during Ms. Hypolite's labor confirmed that she was present in Ms. Hypolite's room on an almost constant basis that day. She was present at 7:03 a.m., 7:15, 7:30, 7:40, 7:55, 8:00, 8:06, 8:30, 8:53, 9:00, 9:30, 10:00, 10:20, 10:53, 11:00, 11:10, 12:15 p.m., 12:30, 12:45, 2:00, 2:28, 2:50, 3:05, and 3:10. Her shift ended at 3:15 p.m. that day. She denied that restraints were used on Ms. Hypolite during her trial of labor. Ms. Hypolite's contention that she was restrained was unconfirmed by any source.

Next, the jury was presented with conflicting physician opinions regarding whether the decision was reasonably made to use Cytotec to induce Ms. Hypolite's labor, considering her pregnancy risk factors; whether Cytotec was administered without a proper order directing its dosage times and amounts; and, whether her informed consent was properly received prior to the use of the Cytotec drug. Ms. Hypolite's expert obstetrician/gynecologist, Dr. James Wheeler, testified that although he believed Cytotec to be the most effective inducer of labor available in 1998, the Cytotec protocol should not have been ordered for Ms. Hypolite. He

9

opined that her high-risk status and the subsequent progress of her pregnancy indicated that she was not a suitable candidate for labor induction and vaginal delivery. He also testified that neither her cervix nor the baby's position was favorable for inducement of labor on the morning the induction commenced. Additionally, he opined that the second dose of Cytotec was given to Ms. Hypolite too soon—five hours and forty-five minutes after the first dose had been given—based on her considerable labor progression at the time. He opined that the cumulative effect of the two, fifty microgram doses she was given was hyper-stimulation, i.e., too many contractions over a short period of time. Since babies breathe in between contractions, he stated that the short length of time between contractions did not allow the baby to get enough oxygen. This, he opined, resulted in the fetal distress that led to the need for an emergency cesarean delivery. In his opinion, it appeared that Ms. Hypolite's providers "were more interested in getting her done than caring for her safely" and that "they pushed her to an extraordinary degree."

Dr. Blue, as well as the defendants' physician-expert, Dr. Whitney Gonsoulin, an obstetrician who specializes in maternal fetal medicine (a/k/a a perinatologist), presented opposing views. Dr. Gonsoulin testified that he believed Ms. Hypolite was an "excellent" candidate for the induction of a vaginal delivery as opposed to a cesarean section. He attributed this to the fact that she had previously had a successful delivery, which indicated the high likelihood of her ability to deliver again. He stated that the premature nature of that birth did not negatively affect this conclusion. Dr. Gonsoulin further opined that Ms. Hypolite's obesity and high blood pressure history actually made her a better candidate for the induction of a vaginal delivery, rather than a cesarean section, due to the complications that could be

10

introduced by those factors during such an invasive surgery. He explained that because of Ms. Hypolite's reported mild high blood pressure, a shorter induction, which was best achieved at the time by using Cytotec, as opposed to a prolonged spontaneous labor, was safer. The Cytotec, he stated, was given according to protocol in the amount of fifty micrograms, every 4-6 hours as needed.

Dr. Gonsoulin stated that the risk of uterine rupture in Ms. Hypolite is a universal risk for anyone delivering vaginally, regardless of high-risk status or whether the labor has been induced. He testified that although uterine rupture is rare, it is not necessarily indicative of a breach of the standard of care, explaining that it has been known to occur in women who have abused cocaine and that it can even occur post-partum.

Dr. Stephen Schorr, also a perinatologist who served on the Medical Review Panel that reviewed Ms. Hypolite's claims prior to the matter proceeding to trial, offered testimony as well. He stated that his review of the complete record of Ms. Hypolite's care showed no breach of the standard of care of the nursing staff or Dr. Blue in the administering of Cytotec for the induction. He too testified that it was administered in the proper dosage amounts within the time guidelines provided by Dauterive's protocol and that Ms. Hypolite was a suitable candidate for its use. He testified that Ms. Hypolite presented with complications which may have put her at risk during her pregnancy and delivery but opined that she was not a very high risk patient, considering the fact that her blood pressure and immune thrombocytopenia were mild cases. He also stated that she was handled safely and appropriately by the nurse midwives during labor and induction. In his opinion, the Cytotec was used properly as a first step measure to soften or ripen the cervix, which needed to happen

11

in this case based on the cervical examinations that were performed on Ms. Hypolite prior to induction.

This testimony and evidence support the jury's verdict that Ms. Hypolite failed to carry the burden of proving a breach of the standard of care by either of the remaining defendants as to these issues.

### *Emergency Cesarean Delivery and Hysterectomy*

As stated earlier, Dr. Blue was present almost immediately after being notified by the nurse midwife on duty of Ms. Hypolite's increased blood pressure and the signs of fetal distress. Dr. Gonsoulin and Dr. Schorr both testified that Dr. Blue acted appropriately under the circumstances. The facts revealed that after attempting to reposition Ms. Hypolite to achieve a deceleration in her blood pressure and an increase in the baby's heart rate, he made the immediate decision to deliver the baby via cesarean in order to save the baby's life. He obtained Ms. Hypolite's informed consent and delivered the baby successfully.

It was only after delivering the placenta and membranes that Dr. Blue was able to assess the condition of the uterus, which had suffered a severe uterine tear and had become almost wholly detached from the cervix. The extreme blood loss and condition of the uterus left him no option but to remove the uterus for the safety of Ms. Hypolite. None of the physicians testifying stated that the hysterectomy was improperly performed or was unnecessary. As testified to by Dr. Schorr, the uterus is a large muscle and muscles can tear when they contract, which was the unfortunate result in this case. All of the physicians agreed that a uterine tear was a possible complication that accompanies a course of labor and that the occurrence here did not absolutely signify a breach of the physician's or nursing staff's standard of care.

12

Considering these facts and opinions, we conclude that the judgment pursuant to the jury's verdict, which found that Ms. Hypolite failed to establish breaches of the standards of care, as to these issues, is reasonably supported by the record as well.

IV.

## CONCLUSION

The jury's respective findings that the defendants, Columbia Dauterive Hospital and Dr. Donald Blue, did not breach their applicable standards of care, are not manifestly erroneous. Costs of this appeal are assessed against plaintiff-appellant, Barbara Hypolite George.

**AFFIRMED.**