# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-817


PAMELA SKINNER, ET AL

VERSUS

CHRISTUS ST. FRANCES CABRINI HOSPITAL, ET AL.


\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 220,689
HONORABLE MARY L. DOGGETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## DAVID E. CHATELAIN[*]
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, James T. Genovese, and David E. Chatelain, Judges.


**JUDGMENT AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND RENDERED.**


**Scott H. Frugé**
**deGravelles, Palmintier, Holthaus & Frugé, L.L.P.**
**618 Main Street**
**Baton Rouge, Louisiana 70801**
**(225) 344-3735**
**Counsel for Plaintiffs/Appellees:**
    **Pamela Skinner, Individually and on Behalf**
    **of the Estate of Robert W. Skinner and as**
    **Natural Tutrix of her minor child, Kelli Skinner,**
    **and Chance Skinner**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**David R. Sobel**
**Jeremy C. Cedars**
**Provosty, Sadler, deLaunay,**
**Fiorenza & Sobel, APC**
**Post Office Drawer 1791**
**Alexandria, Louisiana  71309-1791**
**(318) 445-3631**
**Counsel for Defendants/Appellants:**
       **Christus Health Central Louisiana d/b/a**
       **Christus St. Frances Cabrini Hospital**
       **Stephen T. Ford, LPN**

**Robert L. Bussey**
**Kimmie Leyser-Vercher**
**Bussey & Lauve, LLC**
**Post Office Box 307**
**Alexandria, Louisiana  71309**
**(318) 449-1937**
**Counsel for Defendants/Appellants:**
       **The Louisiana Patient's Compensation Fund**
       **Louisiana Patient's Compensation Fund Oversight Board**

**CHATELAIN, Judge.**

In this medical malpractice case, the defendants, Christus St. Frances Cabrini Hospital (Christus Hospital), Stephen T. Ford, LPN (Nurse Ford), and the Louisiana Patient's Compensation Fund/Louisiana Patient's Compensation Fund Oversight Board (hereafter collectively referred to as the PCF), appeal a jury verdict in favor of the plaintiffs, the widow and two children of Robert W. Skinner (Mr. Skinner), finding that Christus Hospital/Nurse Ford deviated from the appropriate standard of care in the medical treatment of Mr. Skinner resulting in a lost chance of survival for Mr. Skinner and awarding the plaintiffs $250,000. The plaintiffs answer the appeal to request that the judgment be modified to reflect that the defendants' breach of the standard of care caused the death of Mr. Skinner and to increase the amount of damages awarded to reflect wrongful death damages. For the following reasons, we conclude that the jury manifestly erred in finding that Christus Hospital/Nurse Ford's deviation from the standard of care resulted in a lost chance of survival for Mr. Skinner. Nevertheless, finding no manifest error, we affirm that aspect of the judgment in which the jury determined that Christus Hospital/Nurse Ford's deviation from the standard of care did not cause Mr. Skinner's death. Accordingly, we affirm in part, reverse in part, vacate, and render.

## PROCEDURAL HISTORY

On August 18, 2000, Mr. Skinner died the day after he underwent a hemorrhoidectomy and partial sphincterotomy at Christus Hospital in Alexandria, Louisiana. Pamela Skinner, widow of the decedent, individually and on behalf of the estate of the decedent and as tutrix of Chance and Kelli Skinner, minor children of Pamela and the decedent (collectively referred to as the plaintiffs), filed a medical

1

malpractice complaint with the Commissioner of Administration on August 15, 2001, requesting the formation of a Medical Review Panel (MRP) pursuant to La.R.S. 40:1299.47. The original complaint alleged that six medical providers, including Christus Hospital and Nurse Ford, had breached the applicable standard of care in their treatment of the decedent. A MRP was formed and rendered an unanimous opinion on February 9, 2005, finding that "[t]he evidence does not support the conclusion that the defendants, . . . Mr. Stephen T. Ford, and St. Franc[e]s Cabrini Hospital, failed to meet the applicable standard of care as charged in the complaint" and that "[t]he conduct complained of was not a factor of the asserted resultant damages."

The plaintiffs[1] fax-filed suit in the Ninth Judicial District Court on April 29, 2005, against Christus Hospital and Nurse Ford, and the matter proceeded to jury trial from March 23 to 26, 2010. According to the verdict form, the jury determined from a preponderance of the evidence that Nurse Ford and Christus Hospital deviated from the appropriate standard of care in the medical treatment of Mr. Skinner. However, the jury further determined that the deviation from the standard of care by Nurse Ford and the hospital was not a proximate cause of Mr. Skinner's death. On the other hand, the jury found that the negligence of Nurse Ford and Christus Hospital caused Mr. Skinner a loss of a chance of survival, and they awarded the plaintiffs $250,000 in general damages as a result of that loss. The trial court rendered a judgment on May 13, 2010, in conformity with the jury verdict as follows: judgment was rendered in favor of the plaintiffs and against the defendants, Christus Hospital and Nurse Ford, in the sum of $100,000, with legal interest from the date of filing of the request

---

[1]On March 16, 2010, after reaching the age of majority, Chance Skinner filed a motion to substitute party plaintiff on the grounds that he was now entitled to represent himself in this matter.

2

to establish a medical review panel until paid; judgment was further rendered in favor of the plaintiffs and against the PCF, on behalf of Christus Hospital and Nurse Ford, in the sum of $150,000, with legal interest from the date of filing of the request to establish a medical review panel until paid. All costs of the proceedings were cast against the defendants, Christus Hospital and Nurse Ford.

On June 3, 2010, two attorneys enrolled into this matter as counsel of record for the PCF. Thereafter, Christus Hospital, Nurse Ford, and the PCF filed a timely motion for suspensive appeal. The plaintiffs answered the appeal.

The PCF is now before this court asserting three errors: (1) the jury erred in finding that the plaintiffs proved that the negligence of Christus Hospital and Nurse Ford caused a lost chance of survival for the decedent; (2) the trial court erred in not having a jury interrogatory and jury charge concerning the comparative fault of the decedent and other parties or third parties; and (3) the damage award is excessive. In their appeal, Christus Hospital and Nurse Ford allege that the jury erred in finding that the decedent lost a chance of survival; alternatively, they allege that the trial court erred in failing to allow the application of comparative fault to the plaintiffs' lost chance of survival claim. The plaintiffs assert that the jury manifestly erred in concluding that the defendants' breach of the standard of care did not cause Mr. Skinner's death and in awarding them an amount of damages that does not adequately compensate them for their losses.

**FACTS**

On August 7, 2000, after consulting with Dr. Joseph Marrazzo, a colon-rectal surgeon, Mr. Skinner decided to undergo a hemorrhoidectomy and anal fissure repair in an effort to alleviate his painful hemorrhoidal symptoms. As part of the

3

preoperative screening process, Mr. Skinner was asked on five different occasions to list all of the medications that he was taking as well as the dosages of those medications.

Mr. Skinner had not worked since 1985. He had been declared disabled by the Social Security Administration due to several severe psychiatric disorders, including depression, manic depression, anxiety disorder, and paranoia. Mr. Skinner had suicidal thoughts, and he suffered anxiety regarding healthcare-related issues, specifically that of pain control. Since May of 1994, he had been under the care of Dr. Lyn Goodin, a psychiatrist, and had been prescribed Celexa and Remeron, both anti-anxiety drugs.[2] Mr. Skinner also suffered from high blood pressure, high cholesterol, heartburn, and hypothyroidism, for which he took additional medications. During the preoperative process leading up to his surgery, Mr. Skinner properly and consistently listed all of the medications he was taking except for Celexa, a drug that he had been taking daily for months.

Mr. Skinner's surgery was scheduled for August 17, 2000. His body temperature was noted to be 96.5 degrees Fahrenheit shortly after his admission to Christus Hospital. The surgery began at 8:12 a.m. and lasted approximately one hour, with no complications. Although most patients who have the same surgery as Mr. Skinner go home the day of the surgery, Dr. Marrazzo agreed to keep Mr. Skinner in the hospital overnight due to Mr. Skinner's significant anxiety about postoperative pain. Dr. Marrazzo directed that Mr. Skinner's vital signs be monitored as per hospital policy, and he authorized the nursing staff to administer 0.15-0.3 milligrams of Buprenex intravenously for pain every two hours.

---

[2]According to Mr. Skinner's pharmacy records, he began filling prescriptions for Remeron in April 1998 and Celexa in April 2000.

The nurses' notes in Mr. Skinner's chart reflect that he complained of severe pain at the operative sight at 3:30 p.m. but that by 8:00 p.m. he was suffering from only moderate pain. The notes indicate that he received pain medication three times, with the last dose given at midnight. In addition, Mr. Skinner received a thirty milligram dose of Remeron at 11:00 p.m.

Nurse Ford first saw Mr. Skinner at about 8:00 p.m. on the date of his surgery. According to a note Nurse Ford made, Mr. Skinner was sleeping when he checked on him just after midnight, and Mr. Skinner's wife was sleeping in the room. Nurse Ford last saw Mr. Skinner at 5:30 a.m. on August 18, 2000; his nursing shift ended at 7:00 a.m. At 7:45 a.m., Mr. Skinner was discovered to be unresponsive, with no pulse or respirations. A heart code was called, and efforts were made to resuscitate him, but those efforts were unsuccessful, and Mr. Skinner was pronounced dead at 8:12 a.m. on August 18, 2000. At that time, his core body temperature[3] was 94 degrees Fahrenheit.

An autopsy performed on August 21, 2000, noted that Mr. Skinner's death was the result of acute cardio-respiratory failure resulting from polypharmacy with markedly elevated levels of mirtazapine (Remeron) and citalopram (Celexa). The toxicology section of the autopsy listed Mr. Skinner's blood Remeron level at 262.2 nanograms per milliliter; the therapeutic range of Remeron was listed as 4.0-40.0 nanograms per milliliter. Mr. Skinner's blood Celexa level was 701.0 nanograms per milliliter, and the blood level of the metabolite of Celexa, desmethycitalopram, was

---

[3]According to answers.com, a person's core temperature is the "[t]emperature in the part of the body that contains the vital organs. . . . The core temperature is taken internally (e.g. in the rectum or oesophagus) and it usually remains within a narrow range. . . ." The report of the physician responding to the code called for Mr. Skinner indicated that his core temperature was taken rectally.

62.7 nanograms per milliliter; the toxicology report listed, with regard to Celexa, a "steady state in recommended dosage up to 120 [nanograms per milliliter]."

## DISCUSSION

In *Hypolite v. Columbia Dauterive Hospital*, 07-357, pp. 5-7 (La.App. 3 Cir. 10/3/07), 968 So.2d 239, 243 (alteration in original), this court laid out the following principles which are relevant to the case before us:

> Louisiana Revised Statutes 9:2794(A) sets forth the plaintiff's burden of proof against a physician licensed by the State Board of Medical Examiners . . . in a medical malpractice action. The plaintiff must establish:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> 3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
> *Id.* In summary, "[t]he plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom." *Pfiffner v. Correa*, 94-924, p. 7 (La.10/17/94), 643 So.2d 1228, 1233.
>
> Nurses performing medical services are subject to the same standards of care and liability as physicians. *Pommier v. ABC Ins. Co.*,

6

97-1342 (La.App. 3 Cir. 7/15/98), 715 So.2d 1270, *writs denied*, 98-2455, 98-2456 (La.11/20/98), 729 So.2d 562. The hospital is responsible for the negligence of its employees, including nurses, under the doctrine of *respondeat superior*. *Id.* Consequently, in a medical malpractice action such as this one against a hospital, this plaintiff must prove that the hospital, acting through its nurses, owed this plaintiff a duty to protect against the risks involved, that it breached that duty, that the plaintiff suffered injury, and that the purported negligent action was a substantial cause in fact of injury. *Id.* (citing *Farmer v. Reyes*, 95-0734, 95-0735 (La.App. 4 Cir. 11/16/95), 665 So.2d 129; *Seal v. Bogalusa Cmty. Med. Ctr.*, 94-1363 (La.App. 1 Cir. 11/9/95), 665 So.2d 52).

The question of whether conduct fell below the applicable standard of care is a factual determination subject to the manifest error standard of review. *Curtis v. Columbia Doctors' Hosp. of Opelousas*, 03-916 (La.App. 3 Cir. 12/17/03), 862 So.2d 1125. In order to determine whether a standard of care was breached, opinions of medical experts are usually necessary to determine the applicable standard of care under the circumstances and whether there has, in fact, been a breach. *Pfiffner*, 643 So.2d 1228; *see also*, *Herpin v. Witherspoon*, 95-370 (La.App. 3 Cir. 11/2/95), 664 So.2d 515.

In an earlier medical malpractice case against a hospital, the second circuit, in

*Gordon v. Willis Knighton Medical Center*, 27,044[4] (La.App. 2 Cir. 6/21/95), 661

So.2d 991, 997, *writs denied*, 95-2776, 95-2783 (La. 1/26/96), 666 So.2d 679, noted

the following:

[A] hospital is bound to exercise the degree of care toward a patient that his or her condition requires, which must be determined under the particular facts and circumstances. *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713 (La.1986).

A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each particular case. *Hunt v. Bogalusa Community Medical Center*, 303 So.2d 745 (La.1974). We are cognizant of the standard of appellate review used to review findings of fact. A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Thus to reverse a trial court, the appellate court must find from the record that a reasonable factual basis does not exist for the finding, and further that the finding is clearly

---

[4]Because the published opinion fails to give the public domain page breaks, we are unable to cite the opinion as directed by rule 10.3.3 of *The Bluebook*.

7

wrong. *Mart v. Hill*, 505 So.2d 1120 (La.1987). Although the standard of review is high it does not require this court to abdicate its responsibility to review the trial court's findings, nor does it require this court to rubber stamp a jury's answers to interrogatories which are manifestly erroneous.

## I. LOSS OF A CHANCE OF SURVIVAL

The plaintiffs alleged in their petition that the defendants caused Mr. Skinner the loss of a chance of survival due to their negligence in: failing to properly monitor Mr. Skinner postoperatively; prescribing and administering medications which caused Mr. Skinner acute cardio-respiratory failure; failing to monitor Mr. Skinner's reaction to medication administered to him; failing to properly monitor Mr. Skinner's vital signs during the night; overdosing Mr. Skinner on Remeron; and in otherwise failing to act with the required degree of care commensurate with the existing situation.

The defendants counter that even assuming that they did breach the standard of care, the plaintiffs failed to prove that Mr. Skinner had a chance of survival on the morning of August 18, 2000, and that Nurse Ford's actions or inaction caused Mr. Skinner to lose a chance of survival.

In *Benefield v. Sibley*, 43,317, p. 13 (La.App. 2 Cir. 7/9/08), 988 So.2d 279, 289, *writs denied*, 08-2162, 08-2210 (La. 11/21/08), 996 So.2d 1107, *writ denied*, 08-2247 (La. 11/21/08), 996 So.2d 1108, the second circuit wrote:

> Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. A substantial factor need not be the only causative factor; it need only increase the risk of harm. *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713 (La.1986).

> The plaintiff does not have to shoulder the unreasonable burden of proving that the patient would have lived had proper treatment been given. *Smith v. State through Department of Health and Human Resources Administration*, 523 So.2d 815 (La.1988). However, the plaintiff does have the burden of establishing by a preponderance of the

evidence that the defendant's conduct denied the patient a chance of survival. Even if the destruction of less than a 50 percent chance of survival is compensable, the plaintiff must in the first instance prove by a preponderance of the evidence that such a chance existed and that it was lost as the result of the defendant's negligence. [*Id.*]

## A. TESTIMONY[5]

### 1. *Ernest Lykissa, Ph.D.*

As part of the plaintiffs' case in chief, the jury was shown the video deposition of Dr. Ernest Lykissa, a practicing pharmacologist and clinical and forensic toxicologist in Texas. While he does have privileges at several hospitals, Dr. Lykissa acknowledged that he is not licensed to practice medicine anywhere in the United States and that he cannot prescribe medicine.

Dr. Lykissa opined that due to "some inordinate amount of drugs being introduced into [Mr. Skinner's] system" in the twenty-three hours following his hemorrhoidectomy, "he ended up suffering from a polypharmaceutical complication that resulted in his severe cardiopulmonary failure and his demise." He believed that it was the antidepressant Remeron that resulted in Mr. Skinner's death. Although the autopsy revealed that Mr. Skinner had toxic levels of Celexa and Remeron in his body, Dr. Lykissa's opinion that Remeron was the cause of death was based upon the fact that Remeron was given to Mr. Skinner in the hospital. Dr. Lykissa admitted on questioning by the defense attorney that at the time he gave a prior deposition, he erroneously believed that Nurse Ford had given Mr. Skinner a second dose of Remeron, in injection form, at 4:00 a.m. on August 18, 2000.

---

[5]Because the defendants have not appealed the jury's finding that Nurse Ford/Christus Hospital deviated from the applicable standard of care, the testimonies of Carol Starns, LPN, and Judy Kreideweis, RN, regarding nursing standards, are irrelevant to this appeal. Additionally, because we have determined that any deviations from the appropriate standard of care Nurse Ford/Christus Hospital committed did not cause Mr. Skinner's wrongful death or a lost chance of survival, the damage award made to the plaintiffs has been reversed, and the testimonies of Mrs. Skinner and Chance Skinner are irrelevant to this appeal.

Dr. Lykissa explained that Celexa has a half-life of twenty to forty hours. Because there was no evidence that Mr. Skinner was given any Celexa in the hospital and because the metabolite of Celexa was found in Mr. Skinner's postmortem blood sample, Dr. Lykissa believed that Mr. Skinner last took Celexa before his surgery and hospitalization. Nevertheless, he disputed the notion that Mr. Skinner might have taken a lethal dose of Celexa at that time because he survived the surgery and anesthesia without any problems. He agreed, however, that the level of Celexa reported in Mr. Skinner's autopsy was enough to cause "big distress" or death in most people.

Dr. Lykissa found fault with Nurse Ford's documentation of his care of Mr. Skinner, especially with late entries that Nurse Ford admitted to entering after Mr. Skinner's death,[6] characterizing the late entries as "highly suspect . . . of having been put there after the facts in order to cover somebody's back." Although Dr. Lykissa had read Nurse Ford's deposition wherein he stated that the vital signs charted at 8:00 p.m. on August 17, 2000, were actually taken at midnight, Dr. Lykissa refused to accept Nurse Ford's explanation about the discrepancy.

Based on the generally accepted notion that a dead person's temperature drops approximately one and one-half degrees per hour from death until it reaches the temperature of the environment that it is in and his belief that Mr. Skinner's temperature was 99.6 degrees Fahrenheit at 8:00 p.m. on the evening before he died, along with the fact that Mr. Skinner's core temperature at the time of death was noted at 94 degrees Fahrenheit, Dr. Lykissa opined that Mr. Skinner was either already dead or in great distress when Nurse Ford allegedly checked on him at 5:30 a.m. on August

---

[6]Nurse Ford's explanation regarding these late entries is explained later in this opinion where his testimony is discussed.

18, 2000. Nevertheless, Dr. Lykissa acknowledged that people with hypothyroidism often have colder temperatures in the morning. Moreover, he admitted on questioning by the defense attorney that when he calculated Mr. Skinner's time of death, he did not realize that Mr. Skinner's temperature had been recorded as being 96.5 degrees Fahrenheit on the morning of his surgery. He also admitted that his calculations as to Mr. Skinner's time of death were based on his belief that Mr. Skinner had been given his thyroid medicine in the hospital the night before his death.

2. *Steven Ford, LPN*

Nurse Ford testified that he was working the 7:00 p.m. to 7:00 a.m. shift on the date of Mr. Skinner's surgery. He first saw Mr. Skinner at 8:00 p.m., which was approximately ten hours after the surgery. Nurse Ford charted that Mr. Skinner was alert and oriented and that his lungs were clear and did not have any congestion or fluid. Mr. Skinner's respirations were regular and moderate in depth, and his pulse was regular and loud. His color was normal, and his skin was warm and dry. Mr. Skinner reported that he had walked to the bathroom to urinate and void and that he was passing gas. Nurse Ford noted that Mr. Skinner's stomach was soft and that he could hear bowel sounds. Mr. Skinner was complaining of moderate pain at the surgical site. Nevertheless, Nurse Ford's notes indicated that Mr. Skinner was calm and cooperative.

Nurse Ford next saw Mr. Skinner at 9:00 p.m. At that time, he was given Buprenex for pain, along with Zocor for his high cholesterol, Prilosec for his heartburn, Metamucil to help him go to the bathroom, Labetalol for his high blood pressure, and Remeron for his anxiety. Nurse Ford testified the dosage of Remeron

11

that he gave to Mr. Skinner at that time was in pill form, was thirty milligrams, as per doctor's orders, and that it was the only dosage of Remeron that he gave Mr. Skinner.

According to Nurse Ford, he next saw Mr. Skinner at midnight, at which time Mr. Skinner was given Buprenex for moderate pain. At 2:00 a.m., Nurse Ford charted that Mr. Skinner was sleeping and appeared pain free. Nurse Ford explained that when he checks on patients in the middle of the night, especially when they have a family member with them who is sleeping as well, he leaves the lights off and uses a pen light to assess the patient rather than waking them up.

Nurse Ford next saw Mr. Skinner at 4:00 a.m. at which time he checked Mr. Skinner's IV. He noted that Mr. Skinner was "sleeping, snoring, with wife @ bedside." When he last checked on Mr. Skinner at 5:30 a.m., Nurse Ford noted that Mr. Skinner was sleeping on his right side, snoring, and his wife was at his bedside.

Nurse Ford testified that although he completed all of the charting checklists contemporaneously with his assessments of Mr. Skinner, he left the hospital when his shift ended at 7:00 a.m. and later realized that he had not entered all of the narrative notes for his 4:00 and 5:30 a.m. checks on Mr. Skinner. Thereafter, he made the late entries into Mr. Skinner's chart, clearly marking them as such by writing "LATE ENTRY" in all capital letters. Nurse Ford explained that although it is acceptable to make late entries, he tries to avoid the practice. He stressed that all of the information contained in the late entries that he made in Mr. Skinner's chart were true and that he was not trying to hide anything.

Nurse Ford testified that Christus Hospital's policy at the time of Mr. Skinner's hospitalization required that a patient's vital signs be taken at least every eight hours unless specified to be more frequent by the patient's physician. Dr. Marrazzo had

ordered that Mr. Skinner's vital signs be taken routinely. After Mr. Skinner's death, Nurse Ford's supervisor questioned him about why Mr. Skinner's vital signs had not been charted at midnight. Nurse Ford later discovered that although Ms. Betty Rivers, a nurse's aid, had taken Mr. Skinner's vital signs at midnight, she had incorrectly charted them in the 8:00 p.m. slot. Nurse Ford commented that Ms. Rivers could not have taken Mr. Skinner's vital signs at 8:00 p.m. because she worked the 11:00 p.m. to 7:00 a.m. shift. The vital signs taken by Ms. Rivers at midnight indicated that Mr. Skinner's blood pressure was 142/84, his temperature was 99.6, his respirations were twenty, and his heart rate was eighty-six, which indicated to Nurse Ford that Mr. Skinner was doing fine.

3. *Jeffery Rapp, M.D.*

As part of the defendants' case, the jury was shown the video deposition of Dr. Jeffery Rapp, the anesthesiologist for Mr. Skinner's surgery. He stated that anesthesiologists want to have a complete picture of their patient's health status, including "what disease processes are being treated by medications." Because many medications can impact anesthesia management, anesthesiologists need to know what medications a patient is taking. He explained that although it seems redundant, both doctors and nurses question a patient about the medications that they are taking to get a complete list so that the doctors can address any issue as early as possible. Dr. Rapp remarked that normal doses of prescription drugs typically do not cause problems with anesthesia. He added, however, that he would be very reluctant to undertake giving anesthesia for an elective surgery if he knew that the patient had taken a toxic dose of any drug. Dr. Rapp stated that he was not informed at any time post-surgery that Mr. Skinner had suffered any complication related to the anesthesia.

13

According to the pre-anesthesia evaluation, Mr. Skinner listed his current medications as Remeron, Lebatalol, Levothyroxin, Zocor, Prilosec, Thioradazene, and Clonazepam; he did not mention Celexa (Citalapram). Dr. Rapp noted that this list matched one made by Nurse Vasquez on August 17, 2000.[7]

4. *Joseph Marrazzo, III, M.D.*

The jury viewed the video deposition of Dr. Marrazzo, the board certified colon-rectal physician who performed surgery on Mr. Skinner, as part of the defendants' case. He stated that as a surgeon, he would want to know all of the medications a patient like Mr. Skinner was taking before operating on him. Likewise, he would want to know if a patient was taking too much of any prescribed medication. Dr. Marrazzo stated that his patients generally fill out an information form listing their medications and allergies. He later goes over the form with the patient and asks whether they are taking any other medications not listed.

Dr. Marrazzo's chart for Mr. Skinner noted that he had a history of depression, anxiety, and hypothyroidism and listed his medications as Remeron, Lebatalol, Levothyroxin, Zocor, Prilosec, Thioradazene, and Clonazepam. Dr. Marrazzo indicated that he would have listed Celexa if Mr. Skinner had informed him that he was taking it.

Dr. Marrazzo stated that although patients undergoing a hemorrhoidectomy formerly stayed in the hospital for one day prior and two days following the procedure, in 1986 there was a shift to performing the procedure on an outpatient basis, with the patient going home the same day as the procedure. He was unsure

_____

[7]According to Mr. Skinner's records from Christus Hospital, Nurse Vasquez was the admitting RN when he arrived at the hospital on August 17, 2000, for his surgery. The Patient Medication History that she filled out with information supplied by Mr. Skinner appears on page 47 of Joint Exhibit 3.

what the norm was in 2000, when Mr. Skinner's procedure was done. Dr. Marrazzo noted that Mr. Skinner's procedure was straightforward and that there were no complications. He remembered speaking with Mr. and Mrs. Skinner after the procedure about their concerns regarding postoperative pain and that the decision was made for Mr. Skinner to stay in the hospital overnight because of those concerns. Dr. Marrazzo explained that everyone who has a hemorrhoidectomy has severe pain afterward.

Mr. Skinner's surgery ended at 9:10 a.m., and Dr. Marrazzo prescribed a .15 to .30 milligram dosage of Buprenex intravenously every two hours as needed for pain. He was never informed that Mr. Skinner's pain was not controlled. Postoperatively, Dr. Marrazzo ordered Mr. Skinner's vital signs to be taken routinely per hospital policy.

Initially, upon hearing that Mr. Skinner had died, Dr. Marrazzo suspected that his death was caused by a heart attack or pulmonary embolus. He explained that he had no reason to consider Celexa toxicity at that time because he had no knowledge that Mr. Skinner was taking Celexa.

5. *Betty Rivers, CNA*

Betty Rivers is a Certified Nursing Assistant. She provided care for Mr. Skinner on the evening of August 17, 2000, during her shift that lasted from 11:00 p.m. until 7:00 a.m. the next day. She took Mr. Skinner's vital signs at midnight and asked if he needed anything, to which he responded in the negative.

6. *Ronald DeKeyzer*

Ronald DeKeyzer testified that he is the Regional Information Management Executive at Christus Hospital. Defense counsel had asked him to perform research

15

to determine the quantity of Celexa and Remeron charged to Mr. Skinner during his August 17-18, 2000 hospitalization. He stated that Mr. Skinner was charged for two fifteen milligram tablets of Remeron and no charges for Celexa were found. Mr. DeKeyzer explained that the pharmacy department enters the drug charges into the database and that nurses cannot access the pharmacy system.

7. *Terrell Hicks, M.D.*

A video deposition of Dr. Terrell Hicks, the colon-rectal surgeon selected by the plaintiffs to serve on the MRP, was shown to the jury as part of the defendants' case. Dr. Hicks stated that most patients who have a hemorrhoidectomy and anal fissure repair have the procedure performed on an outpatient basis; however, on rare occasions, patients are admitted into the hospital for pain control issues. Although Mr. Skinner had, what he termed, "multiple medical problems," there was no reason why Dr. Hicks would not have sent Mr. Skinner home after the procedure "had he not complained about the anxiety of the procedure or the pain." If he was to perform surgery on a patient who was taking Celexa, Dr. Hicks opined that he would want to know before the operation that the patient was taking the medicine and whether the patient was taking a normal dose, as opposed to too much or too little. With regard to the late entries Nurse Ford made, Dr. Hicks did not think that Nurse Ford was trying to conceal that the entries were entered late. Dr. Hicks opined that because Mr. Skinner had concerns about pain control, it was better to not wake him, as long as his vital signs had already been taken during Nurse Ford's eight-hour shift, in order to reduce the amount of pain medication that he would need.

Dr. Hicks had many concerns about Dr. Lykissa's opinion as to the cause and time of Mr. Skinner's death because Dr. Lykissa made a lot of assumptions and

missed a lot of the facts. His chief concern was that Dr. Lykissa had impugned the nursing staff in his discovery deposition by suggesting that they might have injected him with the wrong dose of Remeron, despite the fact that Remeron can only be given orally. Dr. Lykissa was also wrong in his belief that Mr. Skinner was given Synthroid and two doses of Remeron in the hospital. Dr. Hicks said that it was unfair for Dr. Lykissa to have stated that Mr. Skinner's surgeon or anesthesiologist should have run blood tests when he entered the hospital to test "his levels" because Mr. Skinner never told them that he was taking Celexa, thus, they would not have known what to test.

Dr. Hicks believed that the most likely cause of Mr. Skinner's death was an arrhythmia or heart failure, which Celexa is known to cause, and that his death was sudden and abrupt. Dr. Hicks stated that if he had personally examined Mr. Skinner fifteen minutes before the sudden arrhythmia, he would most likely not have found anything out of the ordinary because people suffering that type of death look great before it occurs, likening Mr. Skinner's death to that of Pete Maravich, the pro-basketball player who died suddenly during a pickup basketball game. He opined that Mr. Skinner may not have survived even if a doctor had been standing at his bedside when the sudden arrhythmia occurred, particularly since no one knew that he had excessive levels of Celexa in his blood.

8. *William George, Ph.D.*

Dr. William George testified at trial on behalf of the defendants as an expert in toxicology and pharmacology.[8] Defense counsel had asked him to review

---

[8]Defense counsel made it known to the jury that Dr. George was not a physician.

Mr. Skinner's records to determine whether Celexa or Remeron were responsible for his death, and he concluded that Celexa was responsible for Mr. Skinner's death.

Dr. George stated that his review of the records indicated that Mr. Skinner was only given one dose of Remeron while in the hospital. He noted that because Remeron cannot be injected, Dr. Lykissa was mistaken in his belief that Mr. Skinner had been given a second dose of Remeron via injection. Dr. George explained that drugs like Celexa and Remeron have therapeutic and toxic ranges in the bloodstream and that the metabolite of Celexa remains active as an antidepressant. In this case, Mr. Skinner had a blood Remeron level of 262 nanograms per milliliter and a blood Celexa level of 701 nanograms per milliliter. Dr. George believed that Mr. Skinner's blood level of Remeron did not fit the dosage that Mr. Skinner told the doctors and nurses that he was taking and that the thirty milligrams of Remeron given to Mr. Skinner in the hospital would not have caused his blood level to be that high. Nevertheless, Dr. George said that the research indicates that a person would need to have about 2700 nanograms per milliliter of Remeron to kill him, much greater than the 262 nanograms per milliliter level in Mr. Skinner's blood at the time of his death. On the other hand, persons have been known to die with Celexa levels as low as 300-400 nanograms per milliliter, but "700 is a level that has been reported to kill." Mr. Skinner had 701 nanograms of Celexa in his blood at the time of his death. He opined that Mr. Skinner was not given Celexa in the hospital but instead took the medicine at home. Dr. George noted that although both Celexa and Remeron work on the nervous system, there is no specific contraindication for the use of them together, and he did not think that the Remeron had much of an impact in this case. Nevertheless, the literature indicates that Celexa is not nearly as safe as Remeron.

Dr. George confirmed that people with hypothyroidism have low body temperatures in the mornings and that Mr. Skinner had been told to not take Synthroid, his hypothyroidism medication, on the day of his surgery. Given the fact that Mr. Skinner had a temperature of 96.5 degrees Fahrenheit on the morning of his surgery and the likelihood that the temperature of his hospital room was between seventy-two and seventy-four degrees, Dr. George opined that Mr. Skinner likely died only a very short matter of minutes before the code was called at 7:47 a.m. He stated that he was "very confident" that Dr. Lykissa was incorrect in assuming that Mr. Skinner's temperature was 98.6 degrees Fahrenheit when he died.

9. *Alan Kaye, M.D.*

Dr. Alan Kaye, a board certified anesthesiologist with a Ph.D. in pharmacology, testified at trial on behalf of the defendants. He stated that persons with hypothyroidism have low morning body temperatures. Dr. Kaye explained that because Mr. Skinner's temperature was 96.5 degrees Fahrenheit at 6:00 a.m. on the day of his surgery and because the record showed that Mr. Skinner had not taken any thyroid medication in the hospital, his temperature would have been 96.5 degrees Fahrenheit or lower the next morning before he died. Based on the foregoing and the fact that Mr. Skinner's temperature was 94 degrees Fahrenheit at 7:47 a.m. when the code was called, Dr. Kaye opined that Mr. Skinner died between 6:00 and 6:30 a.m. Dr. Kaye admitted on cross-examination that when he previously wrote a report in this matter, he mistakenly thought that Mr. Skinner's core temperature at the time of his death was 94.5 rather than 94 degrees Fahrenheit. Nevertheless, Dr. Kaye explained that the discrepancy would have resulted in a twenty-minute change to his estimate of the time of death that was within the half hour range that he had given.

Dr. Kaye stated that based on the codes that he ran during his career, if someone had been dead beyond five to ten minutes, it is very difficult to resuscitate them.

Dr. Kaye attributed Mr. Skinner's death to a drug-induced cardiac arrhythmia or cardiac collapse caused by either a Celexa toxicity or a Celexa and Remeron induced toxicity. He stated that the single thirty milligram dose of Remeron given to Mr. Skinner in the hospital would not have produced the elevated levels shown postmortem. Dr. Kaye believed that Mr. Skinner's death would have been very sudden and abrupt. He explained that Celexa is a serotonin selective reuptake inhibitor that can affect the cardiac conduction system and cause seizures and lethal arrhythmias that are very difficult, if not impossible, to treat. Dr. Kaye opined that Mr. Skinner would have looked absolutely fine five minutes before he died.

Dr. Kaye said that the most likely scenario in this case was that Mr. Skinner was anxious about his surgery and took too much Celexa, failed to tell his surgeon that he was taking Celexa, and suffered from a toxic overdose the next day, within the known twenty to forty hour half-life of the drug. He expressed his strong belief that Nurse Ford and the other healthcare providers at Christus Hospital did nothing wrong and did not cause Mr. Skinner to die. In addition, Dr. Kaye testified that while pharmacologists like Dr. Lykissa and Dr. George can determine a cause of death, because they are not physicians, they are not qualified to determine a patient's chance of survival if they code.

**B. CONCLUSION: LOSS CHANCE OF SURVIVAL**

In this case, the plaintiffs bore the burden of proving that Mr. Skinner had a chance of surviving and that the defendants' negligence denied him that chance. Quite simply, our careful review of the record shows that the plaintiffs failed to

20

produce a scintilla of evidence regarding this issue. To the contrary, the defendants presented unrefuted testimony that cardiac arrhythmia or cardiac collapse caused Mr. Skinner's death and that his death would have been sudden and abrupt; even had doctors personally examined Mr. Skinner fifteen minutes before the arrhythmia, they would have found nothing extraordinary in Mr. Skinner's medical condition. After meticulously examining this record in its entirety, we are convinced that the jury manifestly erred in its determination that Christus Hospital/Nurse Ford's negligence caused Mr. Skinner a lost chance of survival. Accordingly, we vacate and set aside that part of the trial court judgment that awarded the plaintiffs $250,000 in general damages for the lost chance of survival.

## II. <u>WRONGFUL DEATH</u>

The plaintiffs contend that the jury committed manifest error in its finding that the negligence of Christus Hospital/Nurse Ford was a proximate cause of Mr. Skinner's death. They claim that Nurse Ford was not credible, that he was not in Mr. Skinner's room when he claimed to be there, and that he caused Mr. Skinner's death by giving him too high a dosage of Remeron.

The defendants submit that the jury was correct in concluding that the plaintiffs failed to prove by a preponderance of the evidence that Christus Hospital/Nurse Ford's deviation from the standard of care was not a proximate cause of Mr. Skinner's death. They further submit that this court should not reverse the jury's conclusion unless we conclude that there was no reasonable factual basis to support that conclusion.

Dr. Hicks concluded that the most likely cause of Mr. Skinner's death was sudden arrhythmia or heart failure, known risks of having excessive Celexa in the

blood. Likewise, Dr. Kaye opined that the most likely scenario in this case is that Mr. Skinner was anxious about his surgery, took too much Celexa, failed to tell his doctors that he was even taking Celexa, and suffered from a toxic overdose the day following his surgery. He firmly believed that Nurse Ford and the other healthcare providers at Christus Hospital did nothing wrong and that they did not cause Mr. Skinner to die. On the other hand, while Dr. Lykissa opined that Nurse Ford gave Mr. Skinner too much Remeron, thereby causing his death, Dr. Lykissa's conclusions were heavily criticized by Dr. Hicks, Dr. George, and Dr. Kaye. Given the foregoing, we conclude that the jury had ample evidence, including expert testimony, to support its finding that Christus Hospital/Nurse Ford's deviation from the standard of care was not a proximate cause of Mr. Skinner's death.

## CONCLUSION

The jury erred in concluding that Christus Hospital/Nurse Ford's deviation from the standard of care caused Mr. Skinner a lost chance of survival. As a result, the general damage award made to compensate the plaintiffs for that lost chance is vacated and set aside. On the other hand, there is ample evidence to support the jury's finding that Christus Hospital/Nurse Ford's deviation from the standard of care was not a proximate cause of Mr. Skinner's death. Because of these findings, we need not determine whether the trial court erred in failing to provide the jury with an interrogatory and charge concerning the comparative fault of Mr. Skinner or any other party. In addition, all assignments of error concerning the appropriateness of any damage award have become moot.

22

**DECREE**

For the foregoing reasons, the judgment of the trial court awarding the plaintiffs $250,000 in general damages for the lost chance of survival and casting all costs against the defendants, Christus St. Frances Cabrini Hospital and Stephen T. Ford, LPN is vacated and set aside. In all other respects, the judgment is affirmed. All costs of the trial and this appeal are assessed against the plaintiffs, Pamela Skinner, widow of the decedent, individually and on behalf of the estate of the decedent and as tutrix of Kelli Skinner, and Chance Skinner.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND RENDERED.**