# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 17-420 consolidated with CA 17-421

**MARGUERITE FUGLER CARDWELL**

**VERSUS**

**OAKS CARE CENTER, LLC, ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 230,743 C/W 236,315, DIVISION "B"
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, John E. Conery, and Candyce G. Perret, Judges.

**AFFIRMED and REMANDED WITH INSTRUCTIONS.**

**Charles A. Schutte, Jr.**
**Valerie A. Judice**
**Schutte, Terhoeve, et al**
**501 Louisiana Avenue**
**Baton Rouge, Louisiana 70802**
**(225) 387-6966**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Oaks Care Center, LLC**
    **Plantation Management Co., LLC**

**Robert Lewis Bussey**
**Bussey & Lauve**
**Post Office Box 8778**
**Alexandria, Louisiana 71306**
**(318) 449-1937**
**COUNSEL FOR INTERVENOR/APPELLANT:**
    **Louisiana Patient's Compensation Fund and Oversight Board**

**Gregory Brice Jones**
**Paul Damon Hesse**
**Brice Jones & Associates**
**61025 Highway 1091**
**Slidell, Louisiana 70458**
**(985) 643-2413**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Bartley T. Cardwell**
    **Thomas C. Cardwell**

**CONERY, Judge.**

## STATEMENT OF THE CASE

In this nursing home malpractice case, defendants, Oaks Care Center, LLC and Plantation Management, LLC, appeal a judgment adopting a jury's verdict in favor of a ninety year old patient with dementia who was injured in a fall from a bedside chair where she had been left unattended by the nursing home staff. The judgment ordered them to pay, *in solido*, $100,000.00. Also appealing the judgment is the Louisiana Patient's Compensation Fund and Oversight Board, which was ordered to pay $110,386.75 (the balance of the amount awarded).

For the following reasons, we affirm in its entirety the July 29, 2016 judgment in favor of plaintiffs and we assess all appellate costs to defendants, Oaks Care Center, LLC and Plantation Management, LLC. Further, we remand the case to the trial court to conduct a hearing on the post-trial motion to tax trial court costs and determine the date legal interest accrues for all appellants.

## FACTS AND PROCEDURAL HISTORY

On April 16, 2007, Marguerite Fugler Cardwell (Mrs. Cardwell) fell at her residence and was transported to Christus St. Frances Cabrini Hospital (Cabrini) in Alexandria, where she was admitted because of pain in her low back and shoulder. Her doctors determined she had severe spinal stenosis that was thought to be a factor in her fall. While at Cabrini, she was unable to walk without the assistance of two aides. Her hospital bed rails were used to help prevent her from falling.

Upon her release from Cabrini on April 23, 2007, Mrs. Cardwell was transported by Acadian Ambulance (Acadian) to The Oaks Care Center, a nursing home owned by Oaks Care Center, LLC and leased and/or operated by Plantation Management, LLC (collectively, the Oaks). The record reflects that Mrs. Cardwell

arrived at the Oaks at approximately 4:45 p.m. on April 23, 2007. The physician's telephone orders not only showed she had spinal stenosis, but also Alzheimer's, dementia, colitis, anxiety, depression, muscle weakness and debility, gerd, and pain. Mrs. Cardwell's sons were present when she arrived at the Oaks by ambulance and, aside from stepping into the hall for a short period of time while the ambulance crew was unloading her from the stretcher to her bed, a family member was present until she fell asleep in her bed with its rails up at approximately 8:30 that evening. The family testified that no one from the Oaks performed an evaluation on Mrs. Cardwell, and except for one person coming to the room with a potty chair, the family did not see anyone from the Oaks that evening. At some point after all of her family members left, Mrs. Cardwell was placed in a chair and left unsupervised. The record shows that the Oaks staff administered Ms. Cardwell's medication between 5:30 a.m. and 6:30 a.m. on April 24, 2007. Mrs. Cardwell was found on the floor of her room by the Oaks staff at approximately 6:50 a.m. on April 24, 2007. She was transported by ambulance back to Cabrini, where she was treated for the injuries she sustained in the fall in her room.

Mrs. Cardwell timely filed a nursing home malpractice claim alleging that the nursing home was at fault for placing her in a chair without proper assessment of her ability to sit unsupervised. A medical review panel convened as required by La.R.S. 40:1231.8(B)(1)(a)(i). A panel of three doctors concluded that the nursing home personnel did not violate the standard of care because the staff of the nursing home followed "doctors' orders" to have Mrs. Cardwell placed "up in chair, frequency as tolerated."

2

Mrs. Cardwell timely filed the petitions in these consolidated cases—the first in February, 2008, and the second in September 2009, after the medical review panel issued its opinion. In 2011, Mrs. Cardwell passed away from unrelated causes, and in April 2011, her sons filed a motion to substitute proper parties, which was granted. Because this is a malpractice suit, the law[1] requires that damages against the health care provider in excess of $100,000.00 would be paid by the Louisiana Patient's Compensation and Oversight Board (the PCF).

The case proceeded to trial and a Rapides Parish jury rendered a verdict against Oaks Care Center, LLC and Plantation Management Company, LLC in favor of Mrs. Cardwell's sons.

At trial, Mrs. Cardwell's son, Thomas, testified that he completed the registration paperwork for his mother before her arrival at the Oaks and he specifically requested that bed rails be used because while his mother was at Cabrini, she once tried to get up without assistance. She required two aides to help her walk. He also completed a restraint consent form authorizing the use of bed rails. Thomas further testified that he was told by the Oaks that a full assessment would be performed to determine what limitations Mrs. Cardwell did or did not have, and the bed rails would stay up until after that assessment. Mrs. Cardwell's family members testified that upon arrival at the Oaks, she was agitated and did not want to be placed in the nursing home.

Sonia Hagaman, Mrs. Cardwell's granddaughter, testified that before her grandmother was admitted to Cabrini for the fall at home, she was living at home without major problems. She could walk without assistance, feed herself and hold conversations, but was forgetful and had a history of wandering in the yard. At

---

[1] *See* La.R.S. 40:1231.2(B)(1) and (B)(2); and La.R.S. 40:1231.4(B)(1).

3

Cabrini, her grandmother was able to walk only with assistance, but had no swallowing issues. Ms. Hagaman testified that while she was with her grandmother at the Oaks on the evening of April 23, 2007, the only time she saw nursing home staff was when she had to ask the staff to help her grandmother use a potty chair. The bed rails of her grandmother's bed were up, except near her feet. Other than the nursing staff that brought the potty chair when requested, Ms. Hagaman did not see any other staff from the Oaks while she was there. Her grandmother was asleep in her bed when Ms. Hagaman left at 8:30 p.m.

Early the next morning, at approximately 6:45 a.m., Mrs. Cardwell was discovered by the staff of the nursing home on the floor of her room, bleeding. She had apparently fallen from a chair where she had been placed by nursing home staff and left unattended. The nurse's chart stated: "fell on floor, bleeding from nose, swelling noted to right side of head, [complains of] pain to R knee." Another note in her chart stated: "6:50 a.m. Resident attempted to get out of recliner and walk, fell on floor. Assessed resident- bleeding from knee, [complains of] pain at knee." Records from Acadian state: "per [nursing home] staff stated they helped her up and into the chair, then left the room, then [patient] found on floor, fall not witnesse[d.]"

After the fall, Mrs. Cardwell was transported by Acadian from the Oaks back to Cabrini. The records reflect she had bruises on her face, arms, neck, and hands; blood in her hair, ears, and on her face; and a large knot on her forehead. Imaging indicated she had a separated and broken vertebra in her neck, which required spinal surgery. After surgery, Mrs. Cardwell had trouble swallowing and keeping food down and a percutaneous endoscopic gastronomy tube (PEG tube)

was surgically implanted. She remained at Cabrini until May 5, 2007, when she was released to Naomi Heights, another nursing home in Alexandria.

After the fall and subsequent surgery, the evidence showed that Mrs. Cardwell never walked without assistance again, never fed herself again, was in pain, and would pull the PEG tube out, requiring surgical re-implementation. According to Ms. Hagaman, her grandmother was never the same after her fall at the Oaks. She passed away from unrelated causes on January 5, 2011, approximately three years and eight months after her fall.

Mrs. Cardwell's family testified that they were never provided with an explanation by the Oaks about the incident and were never contacted by the Oaks after the event. Testimony at trial was conflicting as to what the Oaks did or did not do with respect to Mrs. Caldwell. The issues centered around whether the Oaks performed a proper assessment before Mrs. Cardwell was placed in a chair, whether and/or why Mrs. Cardwell was placed unsupervised in a chair, whether the chair had arms or did not have arms, whether Mrs. Cardwell was restrained (including bed restraints or rails), and whether the Oaks' charts had been altered or amended after the accident.

In addition to Mrs. Cardwell's family, plaintiffs called an expert nurse consultant, Luanne Trahant, who was accepted by the trial court as an expert in the field of nursing homes and assisted living care. In her expert opinion, Ms. Trahant unequivocally testified that the nursing home violated the applicable standard of care, and that Mrs. Cardwell's fall was a result of the fault of the nursing home staff. Mrs. Cardwell's treating neurosurgeon, Dr. Gregory C. Dowd, then testified that Mrs. Cardwell's fall was the cause of the injuries and fractures to her neck, and her treatment for these injuries was related to her fall at the nursing home.

After the plaintiffs had rested their case, the defense moved for a directed verdict, which the trial judge denied, stating, "there's enough direct and indirect evidence to deny [defendants'] motion."

The defense presented the live testimony of Dr. Michael G. Buck, who served on the medical review panel and was accepted as an expert in family medicine and in nursing home/long-term care for elderly people. The video deposition of Dr. Susan E. Nelson, who was qualified as an expert in internal medicine, geriatric care, nursing home and long term care was also presented to the jury. The defendants' experts testified that the nursing home followed the standard of care and the Oaks was not at fault for Mrs. Cardwell's fall or resulting injuries. Defendants also presented the testimony of Mona Crawford, who was the minimum data set (MDS) coordinator at the Oaks at the time of the accident, and the testimony of Ursherell Price, who was an LPN[2] working at the Oaks at the time of the accident.

At the conclusion of all of the evidence, and after closing arguments, the trial judge instructed the jury. Counsel for all parties approved the jury instructions without objection. The jury instructions included an explanation of the plaintiffs' burden of proving the degree of knowledge and skill possessed or degree of care ordinarily exercised by a nursing home staff; that plaintiffs had to prove that more likely than not the nursing home staff in this case either lacked this degree of knowledge or failed to use reasonable care and diligence; and that Mrs. Cardwell's injuries were caused by the nursing home's lack of skill or failure to use reasonable care and diligence. The jury instructions further stated that the duty of the nursing home was "to provide a reasonable standard of care taking in

---

[2] Licensed Practical Nurse.

consideration each patient's known mental and physical condition" and the nursing home staff's conduct is evaluated "in terms of reasonableness under the circumstances existing" at the time of the incident. The instructions then explained to the jury Louisiana's law on medical review panels and damages; specified what the jury could consider when making an award of damages; and asked the jury to render an impartial verdict, assigning them to "find and declare the truth."

The case was submitted to the jury by way of special interrogatories that were approved by the trial court without objection by counsel. Three questions were asked of the jury. First, "have the plaintiffs, proven beyond a preponderance of the evidence that Oaks Care Center, LLC and Plantation Management Company, LLC, through their employees, breached the applicable standard of care required with regard [to] the care provided to Marguerite Fugler Cardwell[?]" The jury answered unanimously, "yes." Second, "did the breach of the applicable standard of care [the jury] found in question no. 1 above, cause injury to [Mrs. Cardwell] that she would not have incurred otherwise?" By a ten to two vote, the jury answered "yes." And third, "if damages are awardable to the plaintiffs for injury to [Mrs. Cardwell], please specify the amount in dollars." The jury unanimously awarded $100,000.00 for physical pain and suffering, $50,000.00 for mental pain and suffering, and $60,306.75 for medical expenses for Mrs. Cardwell's survival damages. On July 29, 2016, the trial court entered judgment memorializing the jury's verdict in favor of plaintiffs.

The Oaks timely filed a motion for new trial, which was set for a September 19, 2016 hearing. At the hearing, the trial court granted the motion for new trial, vacated its July 29, 2016 judgment memorializing the jury's findings, and rendered

7

judgment in favor of The Oaks, dismissing plaintiffs' case with prejudice at their cost. The trial court signed a judgment on October 7, 2016.

Plaintiffs, Bartley and Thomas Cardwell, filed for supervisory writs with this court, which were granted and made peremptory on January 5, 2017. This court overturned the trial judge's order for new trial and vacated the trial judge's October 7, 2016 judgment, stating:

> **WRIT GRANTED AND MADE PEREMPTORY.** While a trial court is vested with discretion in deciding whether to grant motion for new trial pursuant to La.Code Civ.P. art. 1973, "the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence." *Gibson v. Bossier City General Hosp.*, 594 So.2d 1332, 1336 (La.App. 2 Cir. 1991), citing *Willis v. Louisiana Power & Light Co.*, 524 So.2d 42 (La.App. 2 Cir.), *writ denied*, 525 So.2d 1059 (La. 1988). We find that a fair interpretation of the evidence presented provides support for the jury to conclude that the actions of the employees of Oaks Care Center amounted to a breach of the standard of care and caused the neck injuries sustained by Marguerite Fugler Cardwell. As such, we find that the trial court abused its discretion when it found that a new trial is warranted in this case. Therefore, we hereby reverse the trial court's ruling and enter judgment denying Defendants' motion for new trial. This case is remanded for further proceedings in accordance with this court's ruling herein.

*Cardwell v. Oaks Care Center*, 16-870 (La.App. 3 Cir. 1/5/17). The trial court's judgment of July 29, 2016 awarding damages in the amounts determined in the jury's verdict in favor of plaintiffs was reinstated, and the defendants timely appealed.

## ASSIGNMENTS OF ERROR

The Oaks assigns the following errors:

1.     The plaintiffs did not establish the standard of care applicable to the Oaks;
2.     The jury's finding that the Oaks breached the standard of care was clearly wrong and manifestly erroneous;
3.     The jury's finding that a breach of the standard of care by the Oaks caused damage to Cardwell was clearly wrong and manifestly erroneous; and

8

4. The jury's finding that the Oaks breached the standard of care and caused injury to Marguerite Cardwell that she would not have incurred otherwise was clearly wrong and manifestly erroneous.

The Louisiana Patient's Compensation Fund and Oversight Board assigns the following errors:

1. It was an error to assess prejudgment court costs against the PCF from the date of filing of the medical malpractice complaint with the Division of Administration;
2. It was error by the jury to find that the defendants breached the standard of care;
3. It was error by the jury to find that the defendants "caused" the damages incurred by the plaintiff. La.R.S. 9:2794(A)(3) requires the plaintiff to prove that as a "proximate result" of the defendant's failure to use the required degree of care, "the plaintiff suffered injuries that would not otherwise have been incurred"; and
4. Alternatively, it was error by the jury to assess the damages that were assessed. (Damages are excessive in this instance.)

The assignment of errors of both appellants will be considered in conjunction with one another where possible.

## LAW AND DISCUSSION

In this appeal, our primary objective is to review the trial court record for manifest error and abuse of discretion. In *Evans v. Lungrin*, 97-541, 97-577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735, our supreme court articulated the following standard of review for jury findings: "It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is 'clearly wrong.' *Rosell v. ESCO,* 549 So.2d 840, 844 (La.1989)." *See also Stobart v. State through Dep't of Transp. and Dev'p.*, 617 So.2d 880 (La.1993). Our supreme court further articulated the role of an appellate court when conducting a review for manifest error in *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), 193 So.3d 1110. It explained:

9

In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. *Cenac v. Public Access Water Rights Ass' n,* 02–2660, p. 9 (La.6/27/03), 851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. *Hall v. Folger Coffee Co.,* 03–1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Stobart v. State through Dept. of Transp. and Development,* 617 So.2d 880, 882 (La.1993).

This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Parish Nat. Bank v. Ott,* 02–1562, pp. 7–8 (La.2/25/03), 841 So.2d 749, 753–54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one. *Rosell v. ESCO,* 549 So.2d 840, 844 (La.1989); *Canter v. Koehring Co.,* 283 So.2d 716, 724 (La.1973).

*Hayes Fund*, 193 So.3d at 115-16.

## 1. Standard of Care

The legislature has enacted special legislation limiting the right to sue certain health care providers, including nursing homes. *See* La.R.S. 1231.1(10). Louisiana's Medical Malpractice Act (the MMA) provides that the plaintiff must establish that the health care provider breached the applicable "standard of care" in the locale where the services were provided. *See* La.R.S. 1231.1(22).[3]

In this case, the Oaks and the PCF argue that plaintiffs have failed to establish the proper standard of care for nursing home patients such as Mrs. Cardwell, when she was admitted to the Oaks.

_____

[3] "The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill." La.R.S. 1231.1(22).

10

The trial judge charged the jury, without objection, that the appropriate standard of care the jury was to consider was "reasonableness under the circumstances existing" at the time of the accident, "taking in[to] consideration each patient's known mental and physical condition." Whether a plaintiff establishes the standard of care is subject to a manifest error review. *Goodwin v. Kufoy*, 07-737 (La.App. 3 Cir. 1/16/08), 974 So.2d 815, *writ denied*, 08-368 (La. 4/4/08), 978 So.2d 331.

Luanne Trahant, a nurse consultant with over 24 years of experience as "a Staff Nurse, a Charge Nurse, a Director of Nursing, as well as a Nursing Home Administrator[, who has] provided direct care in nursing homes as a Hospice Nurse, as well as a Nurse Practitioner . . ." testified at length for the plaintiffs. Ms. Trahant has served as a nurse consultant for both plaintiffs and defendants and was qualified as an expert in the field of nursing home and assisted living care by the trial judge in this case.

Before trial, Ms. Trahant reviewed the Oaks' records, Cabrini's records, the medical review panel opinion, the time cards of employees at the Oaks, the depositions of Thomas and Bartley Cardwell (Mrs. Cardwell's sons), Sonia Hagaman (Mrs. Cardwell's granddaughter), Jane Ortego (the administrator of the Oaks when the accident occurred), and Mona Crawford (the LPN who was responsible for compiling the minimum data set that was used to guide the care of Mrs. Cardwell in the nursing home). Ms. Trahant testified that because nurses were the ones assessing Mrs. Cardwell and supervising her, the appropriate standard of care was "the reasonable nursing standard." She went on to explain that the standard of care for a nurse is set forth by "what another nurse would do in [a] similar situation [ ] taking [reasonableness] into account[.]" Ms. Trahant was

11

also qualified as an expert in nursing home care and testified as to what is reasonable for the staff of a nursing home.

The duty owed by a nursing home is similar to that owed by a hospital to its patients. *Rachon v. Cornerstone Village Inc.*, 02-42 (La.App. 3 Cir. 6/5/02), 819 So.2d 473. In *Rachon*, 819 So.2d at 476 (quoting *Lemoine v. Ins. Co. of N. Am.*, 499 So.2d 1004, 1007 (La.App. 3 Cir.), *writ denied*, 501 So.2d 199 (La.1986)), a panel of this court held: "[a]lthough not [the] insurer of the safety of [their] patients, . . . it is the duty of a nursing home to provide a reasonable standard of care taking into account the patient's mental and physical condition." The trial judge appropriately charged the jury on the standard of care and plaintiffs' burden of proof and neither party objected. Considering the testimony about standard of care presented at trial by Ms. Trahant (quoted infra), the jurisprudence, the trial court's jury instructions on the standard of care issue, and the vast discretion afforded a trier of fact, we do not find any merit to the Oaks' first assignment of error.

### 2. Breach of Standard of Care

This court, in discussing the issue of breach of the standard of care, has stated:

> [t]he question of whether conduct fell below the applicable standard of care is a factual determination subject to the manifest error standard of review. *Curtis v. Columbia Doctors' Hosp. of Opelousas*, 03-916 (La.App. 3 Cir. 12/17/03), 862 So.2d 1125. In order to determine whether a standard of care was breached, opinions of medical experts are usually necessary to determine the applicable standard of care under the circumstances and whether there has, in fact, been a breach. *Pfiffner [v. Correa*, 94-924, 94-963, 94-992 (La. 10/17/94)], 643 So.2d 1228; *see also, Herpin v. Witherspoon*, 95-370 (La.App. 3 Cir. 11/2/95), 664 So.2d 515.

*Hypolite v. Columbia Dauterive Hosp.*, 07-357, pp. 6-7 (La.App. 3 Cir. 10/3/07), 968 So.2d 239, 243. Thus, the issue of whether the nursing home breached its duty "is an issue of fact to be determined by the trier of fact, and cannot be disturbed on appeal absent a finding of manifest error." *Lemoine v. Ins. Co. of North America*, 499 So.2d 1004, 1007 (La.App. 3 Cir.), *writ denied*, 501 So.2d 199 (La.1986).

When discussing the communication that occurs between nursing home staff and paramedics and EMTs when a patient is brought to the nursing home by ambulance, Ms. Trahant explained:

> typically the EMT or the paramedic is going to give the nursing home staff whatever paperwork was given to them at the hospital, and then they will report to the staff on the condition of the patient during transport. . . . [S]o there would be some sort of exchange at least . . . in the room about the transfer . . . and anything pertinent that may be important to the nursing home staff.

Ms. Trahant was asked whether she reviewed Acadian's reports from when Mrs. Cardwell was first brought to the Oaks. Ms. Trahant responded affirmatively. She agreed that their records, under "nonemergency profiles" and then "primary conditions for ambulance transport" described Mrs. Cardwell, in pertinent part, as: **"[b]ed confined, Unable to walk, Unable to get out of bed, Unable to sit in chair/wheelchair without assistance (Postural instability)."** Ms. Trahant testified that the staff at the Oaks had a duty to review the Acadian reports and talk with the Acadian personnel at the time Mrs. Cardwell was admitted.

The following colloquy then occurred between Mrs. Cardwell's counsel and Ms. Trahant:

> Q. And in your . . . - - in your experience, does the information that appears on an ambulance run sheet such as what we have seen "primary conditions for ambulance transport", is that the sort of information that is typically communicated verbally, . . . if not in writing, at the time of . . . a patient's admission to a nursing home?

. . . .

A. [I]n the course of communicating with the nursing home staff or the EMTs whatever information they've gleaned from their assessments of the patient should be communicated to the nursing home staff.

Q. Thank you. As far as the fault you found with the Oaks Care Center, did you find fault in the Oaks Care's . . . decision to place her in a, in a chair?

A. [I]t's my opinion that Ms. Cardwell was capable of being in a chair, but that the Oaks Care Center had not completed the assessment process to determine what the safety measure should have been for her to be in a chair . . . unattended in a new place especially with a history of dementia. . . . [O]ne of the problems that occurs is when we change someone's environment that has Alzheimer's or has dementia, it can create a situation where they cannot make reasonable decisions 'cause it's a new environment. . . . [H]er history at the hospital and the hospital records supported that she had poor safety awareness, that she was impulsive . . . and that she required . . . additional safety interventions at the hospital to keep her safe, and so those documents spoke to her inability to understand how to be safe on her own. . . . [S]o it would be below the standard of care to put someone in a chair and leave them unattended in a new environment without any other provisions to keep them safe.

Ms. Trahant further explained that while Mrs. Cardwell was in the hospital at Cabrini, Cabrini's medical records showed that "different safety interventions" that were in place for Mrs. Cardwell included a bed alarm and a seat belt whenever she was in a "Geri chair."[4] She explained that sometimes nursing home staff doesn't have access to the hospital's records at the time the resident arrives. In that case, the best way to determine what had been utilized in the hospital was to talk to the family. When asked whether the Oaks' staff should have been informed of Thomas Cardwell's concerns about his mother's ability to get up and her instability, Ms. Trahant said, **"[t]hat's correct, . . . because in my opinion had**

---

[4] A "Geri chair," also known as a geriatric chair or medical recliner is a large mobile recliner on casters. They are designed to allow non-ambulatory people to get out of bed and sit comfortably in one of three positions while being fully supported. Geri chairs are more comfortable than wheelchairs and/or stretchers, and provide greater fall protection than wheelchairs.

**they gotten that information, took that information into account, then they would not have gotten her up in the chair at an unspecified time and left her unsupervised . . . in that situation."**

She further testified that it would have been reasonable for the Oaks to leave Mrs. Cardwell in bed (for approximately ten or eleven hours) until the therapy staff could more fully evaluate her the following morning. If Mrs. Cardwell had issues at night like insomnia, agitation, or anxiety, it would have been reasonable to put Mrs. Cardwell in an area where nursing home staff could watch her and more attentively respond to her needs. She stated: **"It, in my opinion, was not within the standard to get her up no matter what time they got her up and no matter what type of chair they put her in, to leave her unsupervised without knowing her needs individually at that time."**

One of the primary reasons for Ms. Trahant's opinion that the Oaks breached its standard of care was her review of the nursing home's record of the minimum data set (MDS). The MDS is a comprehensive written report providing an overall assessment of a resident and is used in creating each resident's care plan. The MDS contains assessments by nursing, social services, dietary, and activity departments and compilation typically involves reviewing the resident's medical records, speaking with their family members or caretakers, speaking with the resident, and sometimes physically assessing the resident. The MDS in this case was inconsistent with, among other things, other assessments and records in Mrs. Cardwell's chart, employee time cards, Cabrini's records, and Acadian's records. In her pre-trial affidavit, which was introduced into evidence at trial, Ms. Trahant expressed her expert opinion on this issue as follows:

After reviewing the time cards and testimony, it is evident that the

nursing home records were falsely created after Ms. Cardwell's discharge. Specifically, the minimum data set is not an assessment that is finalized on admission, it is a dynamic document that requires the staff to perform observation, assessment, and interview with the resident, family and staff members. The document is completed over several days and once signed by a discipline, delineates when their section was completed. Mona Crawford was woefully incorrect in her testimony that this information was to be completed the same day as admit. Medicare rules allow the staff to collect data for 5 days to create the minimum data set. Further, as stated in the admission information of the Minimum Data Set, when the staff signs the AA9 portion, they are certifying that they collected or coordinated the collection of the data on the date specified. They also certify that they understand that the accuracy and truthfulness of this document is their personal responsibility and that they may be subject to criminal, civil, and administrative penalties for submitting false information. Interestingly, Oaks Care Center employee Alexa Dozar completed an activities assessment on 4/23/07. However, Ms. Dozer clocked out of the building at 4:25 p.m., which was 20 minutes <u>before</u> Ms. Cardwell was admitted. This calls into question the veracity of the document and the staff member's integrity regarding the assessment and care of Marguerite Cardwell. The dates entered on the assessments are fraudulent and a misrepresentation of what the staff actually did and when. (emphasis added).

In addition, Ms. Trahant was questioned specifically at trial about the Oaks' failure to complete a proper and complete assessment on Mrs. Cardwell before placing her unattended in a chair:

> Q. Do the records show that a complete assessment was done in that fourteen hour period [that Mrs. Cardwell was at the Oaks]?
>
> A. Well, first of all when a nurse talks about an assessment or the term complete assessment, we're not just taking into consideration the completion of one section of a record. In, in Ms. Cardwell's case, she was going to the Oaks Care Center to receive physical therapy and occupational therapy and potentially speech therapy . . . just based on her previous fall at home, the fact that she was ninety years old and was weak and deconditioned. So therapy was also a part of when we use the term complete assessment, and their interventions and assessments would have occurred on the next day when they came in to do an evaluation. The minimum data set was complete . . . as far as it's - - it was filled out. . . . [O]ne of the concerns that I had is just the process that is involved in doing the minimum data set. It's not a document that should be completed in thirty minutes or an hour. It is supposed to take into consideration interviews not only with the resident.

16

[I]n Ms. Cardwell's case, there were certain things the nursing staff could have gleaned from her but because of her mental status and her dementia some of it may or may not have been accurate so they would have also have had to of relied on her family. . . . [T]he minimum data set itself gives instructions to the staff and one of those instructions is to . . . interview the family, talk to the family to see what different types of things have been happening with their loved one over the previous seven days. . . . [W]hen you take that time frame into consideration – that also includes any observations they've made from the hospital records. So there are certain things that can be filled out on the minimum data set whereby a nurse doesn't have to be standing in front of a resident but there are other portions where they actually have to do a physical assessment. They actually have to put their hands on the, the patient or the resident, do certain things to make determinations about what they can and cannot do. . . . [T]hat assessment then drives their actual plan.

In Ms. Cardwell's case, they knew she was at high risk for falls . . . and they accurately assessed her for that. That was one of her number one problems. That's the reasons she had been in the hospital and that is the reason that her family chose to put her . . . in the Oaks. . . . [S]o they knew that from, from the get go.

Ms. Trahant then went on to testify further as to whether the Oaks breached

the standard of care by placing Mrs. Cardwell in a chair unattended.

It makes no difference [(whether she was placed in an armless chair or a recliner)].
. . . .
Once you put them in the chair, then you have to look at do they have the control of their body that's needed to sit in a chair. . . . [B]ased on what we discussed earlier, if Ms. Cardwell had postural instability that is a problem with balance or trunk control. So if I sit her in a chair, I have to know that she's not gonna [sic] do something that creates forward momentum that will dump her . . . out of the chair.

If she's able to walk, which she could walk but only with assistance, then I have to say well, is (sic) she, if she manages to get herself out of this chair is she gonna [sic] be able to walk with any certain amount of, of safety. . . . [T]he - - and the answer to that based on her fall history was more likely than not no, and then if she tries to transfer herself out of this wheelchair or out of this chair whatever chair she's in, what are the chances that she can do it successfully? And in Ms. Cardwell's particular situation, they documented that she had to have two people to even get up and down out of a chair so chances are that type of weakness if she tries to get up, she's gonna [sic] fall out. And then the last thing being you have her in a new environment. So is it the safest thing until you get to know her and have your therapy assessment . . . and if you find that she is anxious or

has to be up in the chair, then do it in a safe manner. Put her in a place where she can be visualized to where the staff can respond to her if she needs something . . . or use even an alarm to let you know her, her - - what she's doing. . . . [A]nd you can respond in kind to whatever her problem is.

There was contrary opinion testimony by all of defendants' experts. Dr. Buck, who served on the medical review panel, was accepted as an expert in the field of family medicine and nursing home and long-term care for elderly people. He testified that a nursing home only fails in its duty if it does not follow the doctor's orders. He further stated that at least half of all nursing home patients will fall each year. In his opinion, there is no evidence that restraints reduce falls, instead they actually increase their frequency. Even though Mrs. Cardwell was a new admission and a high fall risk, he did not think one on one observation was necessary. Mrs. Cardwell was placed in a chair pursuant to a doctor's order that she be "up in chair, frequency as tolerated." According to Dr. Buck, the Oaks did not breach its standard of care. Their conduct, or lack thereof, did not cause any injury to Mrs. Cardwell. He found no evidence that the Oaks' records had been fabricated or were inconsistent. In his opinion and according to the records he reviewed, a full assessment of Mrs. Cardwell had been completed.

On cross examination, Dr. Buck testified that the medical review panel unanimously determined that adequate fall risk precautions were implemented by the Oaks. His conclusion was based on the assumption that the records he was reviewing were accurate. He admitted that if the records he reviewed were inaccurate, that would influence his decision.

He agreed with counsel for plaintiffs that the nursing home, when doing its assessment, should have taken into account the fact that restraints were used for Mrs. Cardwell's protection while she was at Cabrini. He admitted that any

18

information about Mrs. Cardwell's time in Cabrini given to the Oaks' staff by her family members should have been taken into consideration. However, Dr. Buck continued to insist that the nursing home's obligation was to follow the doctors' orders. The doctors' orders stated, in part, "up in chair frequency as tolerated" and did not require the use of bed rails, which are considered restraints.

However, Dr. Buck further admitted that he had no reason to doubt the Cardwell's testimony that the bed rails had been up when Mrs. Cardwell was placed in bed at the Oaks, and agreed it would be fair to say that the nursing home sometimes used restraints without a doctors' orders. His testimony did not explain how the nursing home could evaluate whether the patient could "tolerate" being left in a chair unattended without a full and complete assessment and evaluation of her physical, mental, and emotional limitations, which had not yet been completed.

Dr. Buck testified that the medical review panel had no evidence that an armless chair was involved in a fall. He agreed that it would be hazardous for Mrs. Cardwell to be left in an armless chair given her history, and it's possible the nursing home breached its standard of care when they left her unsupervised. Dr. Buck admitted during cross examination that the nursing home staff knew that Mrs. Cardwell could not sit well and it would have been reasonable to delay unsupervised chair placement until the full assessment was complete.

Dr. Susan Nelson, who testified at trial by video deposition, was hired as a medical expert for the Oaks and qualified at trial as an expert in internal medicine, geriatric care, and nursing home and long term care. She reviewed Mrs. Cardwell's medical records, the medical review panel opinion, and the deposition testimony of Ms. Trahant and Dr. Amy Griffin (who was Mrs. Cardwell's primary care physician), as well as some scholarly articles and journals. Dr. Nelson did not

review the depositions of the Cardwell family members, the administrator of the Oaks, Jane Ortego, or the deposition of the LPN who admitted Mrs. Cardwell into the facility, Mona Crawford.

Dr. Nelson testified that she agreed with the medical panel's conclusion that the Oaks did not breach its standard of care. In her opinion, from reviewing the records, the Oaks conducted a proper assessment of Mrs. Cardwell when she was admitted. The following colloquy occurred:

> Q. With regard to the admission assessment, do you recall that Ms. Cardwell was classified as a one-person assistant [sic] with transfers and ambulation?
>
> A. Yes.
>
> Q. A fall risk assessment was done?
>
> A. Yes.
>
> Q. And Ms. Cardwell was noted or - - to be a high fall risk; is that true?
>
> A. Yes.
>
> Q. Now, in the initial - - do you recall the initial nursing entries of The Oaks nurse, Ms. Medda [sic] Crawford?
>
> A. Yes.
>
> Q. Okay.
>
> A. I mean - -
>
> Q. Well, let me rephrase that. Do you recall that upon admission The Oak staff assisted Ms. Cardwell up into a chair?
>
> A. Yes.

There is nothing in the record to substantiate that the Oaks staff placed Mrs. Cardwell in a chair on admission, and, in fact, Mrs. Cardwell's family testified that she was not. Dr. Nelson then described the "type of care that a nursing home

20

should provide in [Mrs.] Cardwell's case" as "to make sure that they're as - - well and as functioning as possible. So it's to . . . keep them clean and dry and fed and toileted and receive the medicine that's prescribed and any of the therapies that are prescribed[.]"

When asked if she had "an opinion on whether [Mrs.] Cardwell's neck fractures occurred with her fall before her Cabrini hospitalization stay on or about April 16, 2007, or when she fell at The Oaks April 24, 2007," Dr. Nelson testified:

> [w]ell, it was - - it was present when it was looked for April 24th, but it - - it could have occurred before then, because the patient was an unreliable historian and she had significant osteoporosis, and the x-ray was pretty - - the plain films were pretty difficult to interpret.

When asked to explain what she meant by "unreliable historian," Dr. Nelson answered:

> [S]o she had dementia, and so at her level of dementia you can surmise that she's much like out of sight out of mind. So if you don't bring something up, she doesn't remember it independently. And so if - - you know, if her neck didn't hurt, then she wouldn't say it necessarily to somebody.

On cross examination, plaintiffs' counsel established that Dr. Nelson had never treated Mrs. Cardwell, "had no knowledge of her level of dementia prior to 2007," and did not know when "this old neck fracture that she may have had occurred[.]" Like Dr. Buck on cross examination, Dr. Nelson deferred to the neurosurgeon who treated Mrs. Cardwell after she fell at the Oaks, Dr. Dowd, as to whether the fall caused her injuries and damages.

Dr. Nelson agreed that "[n]ursing homes have a duty to attempt to prevent falls and minimize fall-related injuries[,]" "the way they manage the challenge of patient falls is to re-assess the patient and re-adjust whatever needed interventions to prevent falls[,]" "the nursing home staff has to monitor the patient over time to

21

most effectively prevent falls and minimize fall-related injuries[,]" and "[p]atients with dementia are at higher risk for falls." She further agreed with counsel that Mrs. Cardwell's record "does not say how she was in the chair in the first place[.]"

Importantly, the following colloquy occurred:

Q.    The efforts to minimize the risk of falls should be heightened during the first 30 days; is that correct?

A.    Yes.

Q.    One reason is the nursing home staff does not know the patient when they are new?

A.    Correct.

Q.    They don't know the patient's habits?

A.    Yes.

Q.    Therefore, their risk of falls outside of that initial fall risk assessment and any medical records that may have come with them do not necessarily tell the entire story; is that correct?

A.    Yes.

Dr. Nelson further testified that the "benefit of a resident's greatest independence has to be balanced against the risk of falls." She agreed with plaintiffs' counsel's summation of her testimony as: **"a resident must be allowed to fail [sic] before [a nursing home] takes away their freedom."** Obviously, Dr. Nelson's opinion was not accepted by the jury.

Mona Crawford, the MDS coordinator on duty at the Oaks when Mrs. Cardwell was admitted, also testified. In direct contradiction of the information shown in the records of Acadian and the nursing home records, Ms. Crawford testified that Acadian did not give her any report, medical records, or order for Mrs. Cardwell. She testified that the information from the hospital about Mrs. Cardwell was first exchanged by phone. According to Ms. Crawford, she assisted

22

Acadian in getting Mrs. Cardwell in bed and then began the assessment. Ms. Crawford usually had "either the CNA[5] or another nurse . . . with me, [ ] especially . . . if they had a problem with standing or mobility."

Ms. Crawford's admission note for Mrs. Cardwell stated in pertinent part: "at 4:45 on the 23rd of April admitted from St. Frances Cabrini Hospital per Acadian Ambulance with son in attendance to room 513D with orientation to resident and family. **Assisted to the chair at bedside with extensive assistance due to the spinal stenosis and pain.**"

On the section of the admission assessment for chronic pain and advanced dementia, Ms. Crawford wrote "she has a diagnosis of spinal stenosis . . . with a, a status post fall on 4/16/07 with a vertebrae fracture." After completing her initial assessments, Ms. Crawford then completed an MDS assessment summary and a "total plan of patient care," which she further described as "a temporary care plan until an actual . . . full care plan could be done." All of these assessments and summaries were kept in Mrs. Cardwell's chart, which was kept at the nurse's station and available for any nurse to review.

In the care plan, Ms. Crawford indicated that Mrs. Cardwell's position would be "one assistance every two hours," which means "every two hours a CNA would usually go . . . in and assist her to turn." She further testified that after completing her assessments, she would give the nurse on duty an oral report of the resident. Mrs. Cardwell's MDS and Ms. Crawford's admission note for Mrs. Cardwell indicated the family was in attendance. Ms. Crawford testified that if the family was present she would have asked them to help fill out the plan of patient care, implying Mrs. Cardwell's family was not there during these assessments.

---

[5] Certified Nursing Assistant.

23

Mrs. Cardwell's sons and granddaughter, who were with Mrs. Cardwell from the time of her admission until 8:30 p.m., denied ever speaking to Mrs. Crawford or anyone else at the Oaks, except the employee who had helped the granddaughter assist Mrs. Cardwell with a potty chair.

Ms. Crawford's "total plan of patient care" stated that Mrs. Cardwell feeds herself, walks with the assistance of a walker, and was "bed to chair." Bed to chair means "she would be able to . . . be assisted from the bed to the chair." Ms. Crawford testified that it was standard practice at the Oaks to fill out a day book on residents. A day book is "a form of communication . . . between nursing and certified nursing assistant staff." Staff would habitually make entries at the beginning and end of their shifts so the person coming on could read it and know what was going on. When she reviewed the documentation from the Oaks in preparation for trial, she did not see any day book entries about Mrs. Cardwell. Another standard practice at the Oaks was to create an incident report when a patient fell. Ms. Crawford did not come across an incident report on Mrs. Cardwell in the materials she reviewed from the Oaks.

In this case, the jury heard two conflicting views of the evidence. Mrs. Cardwell's family testified that she was not assessed properly and, at least until approximately 8:30 p.m. when they left, Mrs. Cardwell was safe in her bed with the rails up, fast asleep. Ms. Trahant testified clearly and unequivocally that the Oaks breached the standard of nursing care, and its negligence was the cause of Mrs. Cardwell's fall. Dr. Dowd, Mrs. Cardwell's treating neurosurgeon, testified that the fall was the cause of Mrs. Cardwell's injuries and damages.

Ms. Crawford gave conflicting evidence that was not fully supported by the nursing home records, and Dr. Buck and Dr. Nelson gave opinions favorable to the

24

Oaks that its personnel did follow the standard of nursing home care and that the Oaks was not at fault.

The jury was properly and correctly charged on the law and, after due deliberation, returned a verdict in favor of Mrs. Cardwell's family and against the Oaks. Our review of the record convinces us that the jury plainly and simply made a credibility determination when it returned its verdict in favor of plaintiffs.

"[R]easonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

> [I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.

*Id*. "When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings[.]" *Id*. "[O]nly the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Id*. An appellate court may find manifest error in a factual finding based on a credibility determination only "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story." *Id*. at 844-45. "But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, **that finding can**

25

**virtually never be manifestly erroneous or clearly wrong**." *Id.* (emphasis added).

Considering the evidence adduced at trial, including the inconsistent records, the conflicting medical opinions, and the detailed analysis by Ms. Trahant, we find that the jury's findings on whether the Oaks breached its standard of care is not manifestly erroneous.

**3.   Causation**

If the appropriate standard of care is established, and it is determined that standard has been breached, the plaintiff must next prove, by a preponderance of the evidence, that the alleged injury was a result of defendant's breach. *Alexander v. Amelia Manor Nursing Home, Inc.*, 05-948 (La.App. 3 Cir. 3/1/06), 924 So.2d 409.  The jury found, and we are affirming, the standard of care was established and the Oaks deviated from that standard of care.  The jury then found that the Oaks' deviation from the standard of care caused Mrs. Cardwell's injuries and awarded damages therefor.  We have fully covered the issue of causation in the previous sections but will add additional comments on some of the evidence adduced at trial on this issue.

At trial, the hospital to nursing facility transfer form for Mrs. Cardwell was introduced into evidence.  The form clearly indicates she had mobility problems and was "ambulating with assist[.]"  It also states that the patient should be "up in chair freq[uency] 'as tolerated.'"  The statement of medical status stated she had a "very unsteady gait" and she was "confused, oriented to name/place only."  The physician at Cabrini, on his discharge instructions, also ordered a physical therapy and occupational therapy evaluation and six weeks of treatment.  There were no physical therapy or occupational therapy evaluations performed before Mrs.

Cardwell fell, nor had it been determined what she could "tolerate."

Thomas and Brantley Cardwell and Sonia Hagaman all testified that Mrs. Cardwell had been admitted to Cabrini because she fell at home and, while at Cabrini, she could only walk with assistance. After she was admitted to the Oaks, they testified that there was no recliner on Mrs. Cardwell's side of the room, only a chair with no arms. Their testimony was that an assessment was not performed on Mrs. Cardwell, as they saw no one from the nursing home evaluate Mrs. Cardwell after she was admitted. Thomas testified that while at Cabrini, Mrs. Cardwell had tried to get up and out of bed on her own. When Mrs. Cardwell was admitted to the Oaks, Thomas specifically informed the staff at the Oaks that he wanted her bed rails up until she was fully assessed. The rails were up when he and his family left his mother asleep in her bed at approximately 8:30 p.m.

The jury also watched a video deposition of Dr. Joan Brunson, who was "one of the medical review panel members in the matter of Marguerite Cardwell at the Oaks Care Center." Dr. Brunson, admitted under cross examination:

> Q. Hypothetically, placing her in an armless chair and leaving her alone in a room after she had been at the facility a little over twelve (12) hours, most of it sleeping, would not be a display of common sense; would it?
>
> A. I would not consider it to be a display of common sense.
> Q. Placing her in a straight back armless chair would not be within an acceptable level of nursing care; would it?
>
> A. I would not consider it to be acceptable.
>
> Q. You did know at The Oaks Care Center in 2007, at the time of Mrs. Cardwell's fall, the only way recliners would have been in a patient's room would be if the family provided one? Were you aware of that?
>
> A. No.
>
> Q. You did know the Cardwell family had not provided her a

27

recliner?

A. No.

She further testified:

Q. Do you know whether or not Mrs. Cardwell was monitored or visited by any staff member after 2:00 in the morning before her fall?

A. I do not know. I think the next record was at 6. After 6. The next record, entry, if I recall correctly.

Q. And that is the entry documenting that she had fallen?

A. Correct.

Q. There is no entry indicating when she was placed in a chair? Does the record reflect that?

A. It does not.

Urshelle Prince, the LPN on duty the night Mrs. Cardwell fell, described her duties as including monitoring and observing residents. However, she did not know when she administered Mrs. Cardwell's medication, only that it was sometime between 5:30 and 6:30 a.m. She could not say who put Mrs. Cardwell in bed or got her out of bed and put her in a chair. She did not know who left her in the chair unattended. She testified that when someone is given medicine or fed, that information is put in the patient's chart, but she was unable to explain the inconsistencies in the chart of Mrs. Cardwell's medication and food. Acadian's transport records after Mrs. Cardwell fell and was being transported back to Cabrini state: "per nursing home staff, they helped her up and into a chair then left the room; then patient found on the floor. Fall not witnessed[.]" Ms. Prince said she did not remember anyone helping Mrs. Cardwell into the chair or leaving the room. When asked how she knew Mrs. Cardwell fell out of the chair, she said "I must have asked her and that's what she said."

28

After careful review of all the evidence, we find that it was not manifestly erroneous for the jury to have determined that Mrs. Cardwell's fall was caused by the Oaks' breach of its standard of care.

The defendants' expert, Dr. Buck, testified that he would defer to her treating neurosurgeon on the "single subject" of whether the fall caused her neck fracture or not. Dr. Nelson indicated that she would also defer to Dr. Dowd. Mrs. Cardwell's treating neurosurgeon, Dr. Dowd testified unequivocally that her odontoid fracture was more probably than not related to the April 24th fall. He further opined that striking ones head on the ground is a "plausible reasonable mechanism to cause a fracture." We find no manifest error in the jury finding that Mrs. Cardwell's fall caused the neck fracture and resulting injuries and damages. Accordingly, we find that Appellants' assignments of error on causation are without merit.

4. **Damages**

Plaintiffs argue the PCF can only challenge on appeal the appropriateness of a damages award greater than $100,000.00 and has no standing to raise as error, as it did in this case, that the jury improperly found a breach in the standard of care. In light of our decision affirming the jury's finding that the Oaks breached its standard of care, which caused Mrs. Cardwell's injury and damages, we find it unnecessary to express an opinion on that issue.

The PCF appeals only the jury's award of general damages totaling $150,000.00.[6] "General damages are those which cannot be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering,

---

[6] Mrs. Cardwell was awarded $60,306.75 in special damages, and general damages in the amount of $100,000.00 for physical pain and suffering and $50,000.00 for mental pain and suffering. The amount of special damages is uncontested and not before us on appeal.

inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." *Duncan v. Kansas City Southern Railway Co.*, 00-66, p. 13 (La. 10/30/00), 773 So.2d 670, 682 (quoting *Keeth v. Dep't of Pub. Safety and Trans'p.* 618 So.2d 1154, 1160 (La.App. 2 Cir. 1993).

"Vast discretion is accorded the trier of fact in fixing general damage awards." *Duncan*, 773 So.2d at 682. It is well settled that a trial court's findings on the amount of damages is reviewed for abuse of discretion. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). "[T]he discretion vested in the trier of fact is 'great,' and even vast." *Id.* at 1261. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Id.*

The evidence adduced represents that Mrs. Cardwell's injuries caused by her fall at the Oaks were severe: she broke her neck and it had to be surgically repaired. She could no longer feed herself and a PEG tube was used to feed her. She was in pain and pulled the PEG tube out several times and it had to be surgically re-implanted. She was never able to walk by herself again. Her granddaughter testified that her grandmother was never the same after her fall at the Oaks. The evidence supports a finding that Mrs. Cardwell suffered for the remainder of her life until her death three and one-half years later because of her fall at the Oaks. Accordingly, we find the jury was well within its vast discretion in its award of general damages.

After reviewing the record in its entirety, we find no abuse of discretion in

the damages awarded to the plaintiffs.

**5.      Prejudgment costs against PCF**

The 2008 amendment to La.R.S. 40:1299.42(B)(2), which is relied on by the PCF in support of their assertion that pre-judgment costs cannot be assessed against them, is not applicable in this case.  Louisiana Revised Statutes 40:1299.42 was re-designated as La.R.S. 40:1231.2 in June 2015.  Prior to June 2015, the statute was last amended in 2008 pursuant to Senate Bill 652, and enacted into law as Acts No. 558.  The cited text in the PCF Brief reflects the post-revision statutory language.  The 2008 revision language was effective prospectively only, beginning on January 1, 2009.

Mrs. Cardwell's petition for damages was filed on or about February 26, 2008 and her supplemental and amending petition was filed on April 23, 2008.  The 2008 revisions therefore do not apply in this case.  Instead, the statutory language existing at that time provided: "(2) [a] health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient."  We find no merit to this assignment of error.  We note, however, that the trial court has not yet assessed court costs and there is an outstanding motion to assess costs pending in the trial court.  We remand this issue to the trial court for proper assessment of court costs.

## CONCLUSION

For the foregoing reasons, the trial court's July 29, 2016 judgment is affirmed in its entirety.  All appellate costs are assessed against Oaks Care Center, LLC and Plantation Management Company, LLC *in solido*.  This matter is remanded to the trial court for a hearing on the post-trial motion to assess trial

court costs and to properly designate the date from which legal interest accrues.

**AFFIRMED and REMANDED WITH INSTRUCTIONS.**